## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HARRISON SUAREZ, | : | |
| c/o Ali & Lockwood LLP, 501 H Street NE, | : | |
| Suite 200, Washington, D.C. 20002 | : | |
| | : | Civil Action No. _____ |
| Plaintiff, | : | |
| v. | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| COMPASS COFFEE LLC, | : | |
| 1401 Okie St. NE | : | |
| Washington, D.C. 20002; | : | |
| MICHAEL HAFT, | : | |
| 2356 Massachusetts Avenue NW, | : | |
| Washington, D.C. 20008; and | : | |
| ROBERT HAFT, | : | |
| 2346 Massachusetts Avenue NW, | : | |
| Washington, D.C. 20008 | : | |
| | : | |
| Defendants. | : | |
| ------------------------------------------------------------------ | | |

## COMPLAINT

Plaintiff Harrison Suarez ("Plaintiff" or "Harrison"), by and through his undersigned

counsel, files this complaint against Defendants Michael Haft ("Michael"), Robert Haft ("Robert")

and Compass Coffee LLC ("Compass Coffee," "Compass," or the "Company," and collectively

with the Hafts, the "Defendants" or "Haft Family Enterprise"), and alleges as follows:[1]

## INTRODUCTION

1.      This suit challenges the Haft Family Enterprise's pattern of defrauding business

partners and others to unlawfully enrich themselves, including through misuse of government

Covid relief funding.

---

[1] Because the Complaint names and refers to multiple members of the Haft family, Plaintiff has
referred to individuals by their first names to avoid confusion.

2.      Harrison and Michael met as college students at Washington University in St. Louis, and became close friends while serving in the United States Marine Corps. From Quantico to Afghanistan, they often started their days with a cup of coffee together. After bonding over a shared love of that ritual, they decided to start a coffee business when they returned home.

3.      In 2013, they launched Compass Coffee. They opened their flagship roastery in the Shaw neighborhood of Washington, D.C. in 2013. Compass has been enormously successful, growing from a single roastery in 2013 to more than 20 locations around Washington D.C. and a successful consumer packaged goods business.

4.      As Harrison and Michael grew Compass, the Hafts—including Robert Haft, Michael's father—routinely represented to Harrison that they viewed him as a member of their family. Robert impressed upon Harrison that he was grateful for Harrison's service to his country and his loyalty and friendship to Michael, and that he saw Harrison as his own son. Harrison had complete trust in the Hafts and believed they had his best interests at heart.

5.      For years, Michael and Robert deceived Harrison into believing that he and Michael were equal partners in Compass. But they were not: Michael secretly owned a larger share of the business from the very beginning, concealing his ownership interest behind a web of LLCs.

6.      By misrepresenting to Harrison that he was an equal partner in a skyrocketing business, the Hafts extracted years of unpaid labor from Harrison, as well as his 50% ownership of the valuable Compass brand and intellectual property, and, ultimately, forced him out of the business entirely. In 2021, with no warning, Michael informed Harrison that his relationship with Compass was being severed.

7.      Harrison later learned that the Hafts' unlawful activities extended far beyond this one scheme: they used the same playbook to personally enrich themselves over and over, and at the

expense of others like Harrison. In 2020 and 2021, as the government was trying to help small businesses struggling as a result of the global Covid-19 pandemic, the Hafts obtained $10.5 million for Compass in government Covid relief funds, which were designed to help businesses retain and/or re-hire workers, pay rent, and otherwise stay afloat during a challenging time. Instead, unbeknownst to Harrison, the Hafts used that money to pre-pay their own loans to Compass and make risky investments, all while failing to pay their rent and other bills.

8.     After his termination, Harrison sought to exercise his contractual right to a buyout. Harrison's dedicated work and sacrifice to Compass Coffee over the prior eight years had helped Compass Coffee rapidly grow from a nascent, local retail coffee company into an award-winning and highly successful business with national brand recognition and reach. Harrison is contractually entitled to sell his founder units back to the Company and recoup the millions of dollars he rightfully earned for that effort.

9.     On November 15, 2021, Harrison provided timely notice to Defendants under their operative agreement (Section VI.10 of the parties' Fifth Amended and Restated Limited Liability Company Agreement of Compass Coffee, LLC (the "Fifth Amended Operating Agreement")) that he was exercising his right as a Compass Coffee founder to have his Units (as defined in the Fifth Operating Agreement) repurchased.

10.     Defendants, however, have refused to fulfill their contractual obligations to ensure that repurchase occurs. Specifically, they have: (a) prevented an independent valuation firm (or accountant, or accounting firm) – which pursuant to the governing agreement is to be mutually selected by the Founders and paid for by the Company – from determining the Fair Market Value (as defined in the agreement) of Harrison's Units, and (b) refused to effectuate the repurchase of Harrison's Units at Fair Market Value.

11.    To Harrison's knowledge, the only purported "independent valuation" that has ever been done for the purpose of Harrison's contractually-entitled repurchase is one the Haft Family's own accounting firm did in an April 2022 draft report. That report did not adhere in any substantial way with the requirements of the Fifth Operating Agreement and concluded that Harrison's Units were somehow worth *less* than the $200,000 he had invested into the Company years earlier—a preposterous conclusion given that Harrison owned more than 10% of Compass Coffee, and Defendants repeatedly represented during the 2020-2022 time frame that Compass Coffee's value was more than $75 million.

12.    At the same time the Hafts and Compass Coffee were refusing to honor their contractual obligations and fairly compensate Harrison for his contributions to the Company, Michael and Compass Coffee have continued to publicly promote Harrison as being an integral part of Compass Coffee.

13.    Indeed, reflective of the fact that Michael and Compass Coffee are taking advantage of Harrison's continued status as a Compass Coffee founder—despite the fact that he has not had any involvement in its management since July 2021—they continue to this day to: (a) actively advertise and market Compass Coffee using Harrison's name, likeness, and image and (b) claim that Compass Coffee was founded and is run by two Marines and best friends who love coffee and want to help their community. They have also demanded that he personally guarantee additional loans for the company and threatened him with repercussions if he does not do so, despite the fact that he is still on the hook for millions in existing Compass debt and has been personally sued and repeatedly contacted by lenders that Compass has failed to pay back.

14.    The Hafts have engaged in a series of fraudulent schemes that resulted in—among other harms—Harrison being forced out of Compass and stripped of his 50% interest in an

enormously successful brand. The Haft Family Enterprise's series of schemes amount to a pattern of racketeering activity, and Harrison is entitled to treble damages for this harm.

15.     Additionally, there is no legal basis for the Hafts' and Compass Coffee's continued refusal to adhere to their contractual obligations in the Fifth Operating Agreement, which require Harrison's Units to be repurchased from him based on their Fair Market Value. The Hafts and Compass Coffee should be ordered to comply with their obligations to repurchase Harrison's Units for Fair Market Value pursuant to the terms of the Fifth Operating Agreement. In the alternative, Harrison is entitled to monetary damages for Michael's, Robert's, and Compass Coffee's breaches of Section VI.10 of the Fifth Operating Agreement, in an amount to be determined at trial.

16.     Harrison is also entitled to damages resulting from Defendants' fraudulent misrepresentations, which induced Harrison to sign away his 50% stake in the enormously valuable Compass Coffee brand; and their violations of their fiduciary obligations and the implied warranties of good faith and fair dealing.

## THE PARTIES

17.     Plaintiff is an individual who resides in Arlington, Virginia.

18.     Defendant Michael Haft is an individual who resides in Washington, D.C.

19.     Defendant Robert Haft is an individual who resides in Washington, D.C.

20.     Defendant Compass Coffee is a Delaware limited liability company that was originally formed on November 21, 2013.

21.     As detailed herein, Harrison and Michael are the co-founders of Compass Coffee.

## JURISDICTION

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff brings a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. §§ 1961-1968.

23.     This Court has supplemental jurisdiction of the pendent state-law claims under 28 U.S.C. § 1367.

24.     Venue for this action is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district and Defendants are subject to the personal jurisdiction of this judicial district.

## ALLEGATIONS

25.     Harrison and Michael met as students at Washington University in St. Louis.

26.     After college, Harrison and Michael each joined the United States Marine Corps. They were stationed together at Camp Lejeune in North Carolina as weapons platoon commanders and deployed to Afghanistan together. Harrison served his country from 2008-2013, earning the final rank of captain. During his deployment, Harrison embedded with the Afghan National Army in the Helmand Province and was responsible for advising approximately 200 Afghan soldiers on combat tactics and logistics.

### Harrison and Michael Develop Compass Coffee

27.      Harrison and Michael became close friends through their service together in the Marines, where they bonded over their mutual love of coffee.

28.     When they returned home, Harrison and Michael devoted themselves to learning everything they could about coffee. With the help of a loan from Robert, they bought a house together in North Carolina. After their time in the Marine Corps ended, they decided to move back to Washington, D.C. and start a business together. Michael invited Harrison to live with his family in their home, and Harrison accepted.

29.    Upon returning to Washington, D.C., Harrison and Michael co-authored a best-selling e-book called *Perfect Coffee at Home*, which became the top cookbook on Apple's iBookstore, and ultimately was featured – along with Harrison and Michael – in *The New York Times, The Atlantic,* and *National Public Radio,* among other publications. Around that time, Harrison and Michael formed their first LLC, HaftSuarez. They each owned 50%.

30.    Spurred on by the success of their e-book, Harrison and Michael decided to create a coffee roastery and retail business. They contracted with Story Ark, a creative agency, to help them design a brand—which became Compass Coffee. In November 2013, Harrison and Michael formed Compass Coffee as a Delaware limited liability company.

31.    Unlike Harrison, who has middle-class beginnings, Michael comes from a prominent Washington, D.C. family with significant business holdings, including, at various times, Crown Books, Vitamins.com, Trak Auto, Shoppers Food Warehouse, Combined Properties, and Dart Group Corporation.  Accordingly, Michael's father, Robert, was in a position to support the development of Compass Coffee, and played a large role in both funding and management of the business from the beginning.

32.    Harrison and Robert grew close in those years. Robert acted as protector and benefactor of Harrison and Michael, teaching them the ways of entrepreneurship.

33.    Compass Coffee promoted itself in its early days as a business founded by two Marines (Harrison and Michael) who shared the goal of creating great coffee to be sold at Washington D.C. cafes that would help build positive community experiences.  For example, one such marketing pitch stated:

> Compass Coffee was founded in 2014 by two Marines with a vision of creating 'Real Good Coffee' – an aspiration that is more than just an outstanding cup of coffee; it's a commitment to ethical sourcing, skillful blending, and peak roasting. With the hope to grow cafes in and around DC, Compass Coffee's

goal is to provide experiences that go beyond a cup of coffee, crafting rituals
that bring people together and enrich daily life.

34.     On September 21, 2014, Compass Coffee opened its flagship roastery at 1535
7th St. NW, in the District's vibrant and historic Shaw district.

35.     During these years, Harrison lived frugally and did not take compensation out
of Compass Coffee, all in an effort to maximize its resources, spur on its success, and derive
the greatest financial value to himself, Michael, and his coworkers in the long run.

36.     Compass Coffee proved, over time, to be wildly successful, engendering positive
press and excellent customer feedback fueled by both its good coffee and well publicized story of
being founded by two former Marines trying to enrich their local community.

37.     As of the date of this Complaint, Compass has more than 20 cafés.[2]

38.     In addition to its cafés, Compass Coffee has also developed and scaled a consumer-
packaged goods business that, upon information and belief, proved even more profitable than
Compass Coffee's cafés.

39.     Due to its success, Compass Coffee drew the attention of the largest players in the
coffee retail space.  For example, by 2020, Harrison and Michael had met with, among others, the
Chief Executive of Starbucks and were courted by Nestlé USA.

**The Ownership Concealment Scheme**

40.     When Harrison and Michael first formed Compass Coffee LLC in 2013, they made
equal cash contributions of $100,000, and they each—according to Compass's first operating
agreement—owned 25% of the business. Based on representations made by the Hafts, as detailed
below, Harrison reasonably believed they were equal partners. As member-managers of Compass

---

[2] *See* https://www.compasscoffee.com/apps/store-locator.

Coffee LLC, Michael and Harrison owed each other a fiduciary duty of loyalty and care.

41.     The remaining 50% of Compass Coffee LLC was owned by Colby Bartlett LLC. Michael and Robert repeatedly represented to Harrison that Colby Bartlett was owned and operated by Robert Haft. Robert is the Managing Partner of Colby Bartlett LLC, and he signed Compass's first operating agreement on behalf of the entity.

42.     In fact, Colby Bartlett was only 4% owned by Robert Haft. The remaining 96% was owned by Michael and his two siblings. Accordingly, Michael actually owned a significantly larger share of Compass than Harrison from the very beginning of the business—a fact Michael and Robert actively concealed from Harrison for years.

43.     And shortly after Compass's founding, Michael secretly became the majority owner of the Company. On April 14, 2015, Robert renamed an entity that had been called "MHaft LLC"—which was 100% owned by Michael—to be "Octa LLC." On information and belief, Robert did this to conceal Octa's true ownership. A few weeks later, on May 7, 2015, Robert emailed Michael and Harrison to report that Colby Bartlett had transferred its 50% interest in Compass to Octa LLC (40%) and Hexad LLC (10%). Octa LLC (like its predecessor, MHaft LLC) is 100% owned by Michael Haft, though at the time, Harrison continued to believe based on misrepresentations by the Hafts that this was one of Robert Haft's LLCs. After this transfer, Michael held 75% interest in the company. Harrison still held 25%.

44.     Through a pattern of deception described in more detail below, Michael and Robert actively concealed the fact of Michael's majority ownership of Compass and perpetuated the false representation that Michael and Harrison were equal partners.

45.     First, Robert and Michael affirmatively misrepresented to Harrison that Colby Bartlett was wholly owned by Robert Haft. This began even before Michael and Harrison launched

Compass, during their service in the Marines, when they sought funds to buy a house in North Carolina. Michael and Robert represented that the money was coming from Robert, and that he was using Colby Bartlett to do so. For example, in an email Michael sent to Harrison on September 9, 2012, Michael represented that Colby Bartlett was equivalent to his father. He wrote: "Our mortgage lender (Colby Bartlett) insists that he is happy to lose money on our house," continuing to equate Colby Bartlett throughout the email with a singular individual who Harrison reasonably understood to mean Robert Haft. Harrison responded: "[t]hank your dad for me again please." Similarly, on November 21, 2013, after they had launched Compass, Michael sent an email to a potential contractor and forwarded it to Harrison, in which Michael referred to "our third partner"—that is, Colby Bartlett—and wrote "Our third partner also happens to be my dad ;)."

46.     Robert consistently misrepresented that he personally—through Colby Bartlett—was providing the capital for Compass in those early days. He regularly told Harrison that this provision of financial support was out of gratitude for Harrison's devoted, long-time friendship to Michael. He also regularly said that Harrison and Michael had served their country, so the least he could do was financially support their venture.

47.     As Michael and Harrison geared up to launch Compass, Robert advised that they follow his approach of setting up single-owner, single-member LLCs to own their shares in Compass, as an added layer of legal protection. In the process, he continued to represent that Colby Bartlett was a single-owner, single-member LLC, just a legal fiction that was essentially Robert himself, and advised Michael and Harrison to do the same thing.

48.     Robert was the signatory for both Colby Bartlett LLC and Octa LLC in Compass documents, including the first three operating agreements.

49.     In addition to concealing the ownership of these LLCs, Michael and Robert persistently misrepresented that Michael and Harrison held equal ownership in Compass. The capital contribution tables of Compass's operating agreements reflected this equal division. The first operating agreement contained the following ownership percentages: Harrison 25%, Michael 25%, and Colby Bartlett 50%. The second operating agreement—which Robert, working with the Haft family lawyer, took the lead on drafting and preparing—contained the same ownership percentages (now with Octa owning Colby Bartlett's interest): Harrison 25%, Michael 25%, and Octa LLC 50%. The operating agreements showed Harrison and Michael as owning equal percentages, despite the fact that Michael was the sole owner of Octa. It now seems that the capital contribution table was a false and deliberate misrepresentation designed to deceive Harrison into thinking he was still on equal footing with Michael.[3]

50.     Michael, Robert, and Harrison had numerous phone and email communications with three attorneys for Compass and/or the Haft family about the preparation and execution of these operating agreements during the period November 2013 to March 2014 (for the first operating agreement) and January 2016 (for the second operating agreement). This included, as just a few examples, a conference call on January 13, 2014 at which Michael, Harrison, two attorneys, and, on information and belief, Robert were present, as well as a January 14, 2016 email from Robert to Michael and Harrison enclosing the draft second agreement.

51.     Michael regularly said to Harrison that they were equal partners. In just one example, on July 7, 2016, Michael confronted Harrison the morning after Harrison's girlfriend's birthday about Harrison and his girlfriend's plans to get engaged. Michael said to Harrison

---

[3] Despite the fact that Robert reported that Colby Bartlett had transferred some of its interest to Hexad LLC (and the rest to Octa), according to the capital contribution table, it actually all went to Octa. It is not clear why.

something to the effect of: "I spoke with my dad. If you and [your girlfriend] want to get married, I don't think we're going to be able to keep being equal partners." Demonstrating how deeply important his investment in Compass Coffee and his continued relationship with the Hafts was to him, Harrison ended the relationship.

52.    As a result of the Hafts' repeated misrepresentations and fraudulent omissions, and Harrison's resulting belief that he had equal equity in a growing and thriving business, Harrison poured time, energy, and money into the company, and shouldered equal burdens with Michael.

53.    Harrison worked full-time for Compass, for the most part completely uncompensated. He did not take a salary for years. In 2019, he invested an additional $100,000 into the company, ultimately investing all of his savings from his military service into the company.

54.    Also based on the Hafts' representations that Harrison and Michael were equal partners—and Harrison's belief that he would enjoy equal upside in the Company's success—Harrison agreed to personally guarantee many leases and debts equally with Michael, including at least $24 million in rent on Compass facilities, and $5 million on a line of credit from Eagle Bank.

55.    In addition to working 80+ hour weeks for Compass, Harrison performed years of uncompensated labor for Union Kitchen, an affiliated business that the Haft family was significantly invested in, and over which the Haft family ultimately became supermajority control owners. He recruited new board members, helped craft a new business plan, drafted contract templates for Union Kitchen's accelerator members, and recruited new entrepreneurs and brands to take investment and mentorship from Union Kitchen.

56.    Harrison also agreed to harsh provisions in the Compass operating agreements, based on misrepresentations by the Hafts that they would apply equally to him and Michael, as

equal partners. In 2016, Robert advised Michael and Harrison to update their operating agreement. He told them that the amount of growth capital required was much larger than expected and that Compass needed to professionalize to prepare for the possibility of outside investors. This led Michael and Harrison to sign Compass's second operating agreement. One provision in that agreement said that Compass could terminate Harrison at any time, value the company at any amount—which Harrison could not appeal—buy him out for 20% of that amount, and the remaining 80% would be in an unsecured note. Robert justified the provision by pointing out that Michael was also subject to the same terms, but—as Harrison later learned—this was false. Michael was never actually exposed to the same risk of termination, because he was already the supermajority owner of Compass.

57.    Additionally, under the second operating agreement, the Haft family LLCs could dilute Harrison's interest in the company at the drop of a hat by converting their convertible debt into common units at an absurd ratio. The operating agreement provided that debt could be converted to Series A Preferred Units at a price of $18 per share. Series A Preferred Units could then be converted to common units at a ratio as high as 1 Series A Preferred Unit to 146,666 common units. This seems to suggest that the Hafts could convert their $2.6 million in debt into 21.5 *billion* common units, diluting Harrison's 100,000 common units to a tiny fraction of the company.

58.    But for the Hafts' misrepresentations, Harrison would never have agreed to the draconian terms of the second operating agreement.

59.    And, most significantly, Harrison assigned his 50% interest in the Compass brand to Compass Coffee LLC for no consideration ($0), again relying on the Hafts' misrepresentation that he had an equal share in Compass to Michael. HaftSuarez LLC—the original LLC that

Harrison and Michael each had 50% ownership of—had continued to own the Compass brand as Compass Coffee grew. On August 2, 2018, Harrison and Michael assigned HaftSuarez LLC's ownership of the Compass brand to Compass LLC for free. A couple years later, the Haft family accountant valued the brand at $34 million. Harrison agreed to make this transfer because he believed that he and Michael would continue to be equal owners of the brand post-transfer. Because Michael in fact owned more of Compass LLC than Harrison, folding the equity value of HaftSuarez LLC into Compass LLC resulted in an enormous equity value transfer from Harrison to Michael for no consideration; this value transfer was induced by the Hafts' misrepresentations that Harrison was an equal partner to Michael and that they had his best interests at heart. Harrison would never have agreed to do any of these things had he not been induced by the Hafts' misrepresentations.

60.    In September 2018—after assigning away his interest in the Compass brand— Harrison inadvertently discovered Octa's true ownership while reviewing documents in the process of Compass seeking a loan. When Harrison confronted Michael about this on or about September 22, 2018, Michael admitted that he had concealed that fact, stating that he did so at the direction of his father.

61.    At the time, based on their years-long working and personal relationship, Harrison reasonably believed this was an isolated breach of trust. He knew that Robert cared deeply about privacy, and he attributed the secrecy around Octa to those concerns. He still believed—based on their repeated representations to this effect—that the Hafts had his best interests at heart and viewed him as a member of their own family. He believed based on those years-long representations and reassurances that his stake in Compass was safe. It was not until Harrison discovered Colby Bartlett's true ownership years later—and that Michael had secretly had a larger

share of the business *since day one*—that he had enough information to understand what was truly going on: Michael and Robert had been lying to him, to manipulate him into relinquishing ownership and authority in Compass, since the very beginning of the business.

62.    The onerous provisions of the Second Operating Agreement also meant that when Harrison learned about Michael's ownership of Octa, the Hafts had already ensured that he was powerless to do anything. As described above, the Hafts had the ability to terminate him for any reason and then pay him only a fraction of what his shares were worth, as well as to unilaterally dilute his common shares. On top of all this leverage, the Hafts had ensured that Harrison was completely financially dependent on them at this time. He was living in their home, was still in debt to them for the North Carolina home loan, and had invested all his money into Compass and had not received any income since 2013 despite doing an extraordinary amount of work for Compass and other Haft family businesses.

63.    Harrison did not learn the truth about the fact and duration of Compass's severely lopsided ownership until 2022, when he first noticed inconsistencies in who would sign documents on behalf of various Haft family LLCs. This prompted Harrison to investigate further, at which point he discovered Colby Bartlett LLC's certificate of formation and its true ownership. Harrison could not have reasonably discovered Colby Bartlett's ownership before this time: Michael did not upload this document to the company shared drive until late March 2020, and Harrison did not otherwise have access to it. By the time Harrison learned all these facts, it was too late to salvage his financial interest in the Compass brand, escape the draconian contractual provisions, or undo his joint and several liability for Compass's extensive financial obligations.

**The Covid Relief Scheme**

64.    In 2020, the pandemic took a financial toll on Compass, as it did on many small

businesses. Sales declined precipitously, and Harrison and Michael had to lay off 80% of their team.

65.    At the time, Michael, working closely with his father, controlled the company's finances and served as the Chief Financial Officer of the company. By the Hafts' design, Harrison barely interacted with the finances in all his time at the company.

66.    As the pandemic continued, the U.S. government began offering financial relief to small businesses. Compass applied for and received several loans and grants from the Small Business Administration (SBA) to replenish its empty bank accounts. Compass was supposed to use this money to pay the Company's bills during the crisis, including payroll, rent, and other designated operating expenses.

67.    These government loans and grants provided Compass with a major cash infusion during 2020 and 2021. Compass began 2021 with $1.18 million in cash on hand. It received more than $8.6 million from the government shortly after. In the aggregate, Compass received $10.5 million in Covid relief.

68.    First, Compass received an Economic Impact Disaster Loan (EIDL) of $500,000 in April 2020.

69.    The same month, it received a loan through the Paycheck Protection Program (PPP1), for $1,330,550.

70.    In April 2021, Compass received an additional loan under the Paycheck Protection Program (PPP2) for $1,816,813.

71.    In May 2021, Compass received a grant from the SBA through the Restaurant Revitalization Fund. The grant was for $6,852,587.

72.     The government highlighted Compass as a model recipient of its Covid relief funding. Two White House officials, the Secretary of Veterans Affairs and the Administrator of the SBA, visited a Compass café to announce the grant award, and to spotlight Compass as a recipient and the administration's efforts to help small businesses make ends meet during the pandemic.



73.     All of the Covid relief that Compass received had restrictions attached with respect to what the funds could be used for.

74.     The EIDL loan could be used "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter."

75.     The RRF grant could be used for any of 11 eligible uses, including payroll costs, rent payments, and other operating expenses. This list of eligible uses explicitly excluded prepayment of debt.

76.     The PPP loans were aimed at enabling small businesses to keep their workers on payroll, and could be used to help fund payroll costs, including benefits, and could also be used to pay for mortgage interest, rent, utilities, worker protection costs related to Covid, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations.

77.     In violation of these limitations, and without Harrison's knowledge, Michael and Robert diverted Covid relief funds for impermissible uses and personal gain.

78.     On or about October 8, 2021, months after Harrison's termination and without Harrison's knowledge, Robert and Michael used RRF grant funds to pre-pay themselves $2 million for outstanding convertible notes, despite the fact that the notes did not come due until July 2022. Those notes had amounts accruing at 5% interest. Months later, in July 2022, Michael issued a new note to Compass from Octa LLC, this time at 8% interest.

79.     Right around the time that Michael and Robert withdrew $2 million from Compass, they invested the same amount of money in a seed fund at Union Kitchen to grow the Company's consumer packaged goods business. On information and belief, Michael and Robert took money out of Compass to invest in Union Kitchen.

80.     In November 2021, without Harrison's knowledge, Compass used RRF grant funds to make an approximately $2.1 million investment in a bitcoin play through MicroStrategy.

81.     At the same time they were pre-paying Compass debt to themselves and making risky investments, Compass, Michael, and Robert represented to Harrison, to the SBA, and to the public that Compass was using the Covid relief money for working capital to keep the business afloat: specifically, for payroll, rent, and other urgent needs. For example, Michael and Compass indicated on their funding applications that they would use the capital for these permissible

purposes. Months after the funds were dispersed and spent, Michael and other Compass employees were interviewed and spotlighted in a video published online by the SBA on January 14, 2022. In the video, they reported that they had used SBA funds to keep people employed, to retrain employees, and to keep the business running.

82.    Rent was a particularly big concern at the time. Compass had deferred its rent obligations during the peak of the pandemic, but, as Michael repeatedly represented to Harrison, planned to begin paying rent again and settle its past-due bills with the influx of cash in 2021.

83.    In 2021, Harrison was negotiating a payment plan with Compass's landlord at 1401 Okie Street NE. But in mid-2021, Michael announced that he would take over that negotiation. He informed Harrison that Compass was going to start paying its full rent on that location.

84.    Harrison reasonably believed based on all of these representations that Compass was using the SBA funds to get current on rent for the many leases Harrison had personally guaranteed.

85.    Unknown to Harrison, Michael and Robert did not pay rent—despite the fact that rent, of course, was one of the specified purposes of the SBA loans. In April, May, and June of 2021, just after the influx of cash from the PPP2 loan and RRF grant, Compass paid $10,000 each month on a $100,626.73 monthly rent bill. By January 2022, Compass owed its landlord $1,418,597.29.

86.    Defendants also falsely represented to the public that they had not received SBA funds yet when they had. In July 2021, Michael told a reporter for the Washington Business Journal that Compass had not yet received its RRF funds. This was false; Compass had received the money in May 2021. On information and belief, Michael made this misrepresentation to conceal the fact

that Compass had received a cash infusion, which could have caused landlords to come knocking for past-due rent.

87.    As already noted, Harrison had jointly and severally guaranteed Compass's leases equally with Michael. He was personally sued over Compass's default on the 1401 Okie lease. Though that suit ultimately settled, Harrison was forced to incur thousands of dollars in legal fees, which, according to the operating agreement, Compass was obligated to reimburse. Although Harrison provided all the requisite documentation for reimbursement in December 2023, Compass never reimbursed those expenses.

88.    Harrison also received a demand letter from Compass's landlord at 3208 Ballston Quarter, indicating that Compass was behind on its rent. He later learned that Compass was nearly $250,000 in arrears on another lease, for its location at 655 New York Avenue NW.

89.    Compass defaulted on other debts besides rent, too. In September 2022, Harrison learned that Compass had defaulted on the terms of its loan agreement with Eagle Bank due to failure to maintain sufficient collateral. Because he had personally guaranteed that loan too, Harrison received a default notice. Compass failed to ameliorate the problem, and Harrison received a second default notice in January 2023, indicating that the value of Compass's collateral had declined even further below the required level.

90.    Had Harrison known earlier that the Hafts (and Compass, by the Hafts) planned to divert Covid relief funds for personal gain and fail to keep up with its rent obligations, he could have ensured the funds were used properly, intervened in negotiations with Compass's landlords, or otherwise mitigated the harm from Compass's defaults on its various debts.

91.     The SBA funding agreements required an accounting of the uses of the funds, and provided that the SBA would forgive the loans so long as they were properly spent on eligible uses.

92.     Michael prepared spreadsheets reflecting that Compass had paid certain rent bills that it had not in fact paid, including on 1401 Okie, the property over which Harrison was sued. On information and belief, those spreadsheets were submitted to the SBA in support of Compass's PPP loan forgiveness applications. Compass's PPP loans were forgiven in full.

93.     Harrison only learned about the accounting discrepancies after he was terminated, and inadvertently in the process of reviewing documents. In fact, most of the Covid relief funding was spent after Harrison was terminated.

**Michael Terminates Harrison from Compass**

94.     By the Spring of 2021, Harrison had become concerned and frustrated by a number of factors related to his role and stake in Compass Coffee, including but not limited to his: (i) continued dilution;  (ii) need to receive some form of compensation to support his life and health care needs; (iii) increasingly diminished voice in the decision making at Compass Coffee; and (iv) increased lack of trust that Michael—whom Harrison had once seen as his closest friend—had Harrison's best interests in mind.

95.     After a verbal conversation concerning these subjects resulted in an argument between Harrison and Michael, Harrison memorialized his concerns in a letter, which he hand-delivered to Michael in May 2021.

96.     Harrison hoped and expected that the letter would result in a positive dialogue between the two co-founders, but it did not.

97.     Instead, on July 19, 2021, Michael sent Harrison—who he knew to be out of the country—an email in which Michael advised Harrison that he did not "see a path where we can continue at Compass together." Michael stated that he therefore "would like to begin the process of separating our business relationships" and offered Harrison "a few variables to consider regarding the same."

98.     Michael thereafter instructed Harrison not to come to Compass Coffee's office, locked Harrison out of it, removed Harrison from the Company's systems—including cutting off his access to Trello, Compass's main platform for work communication—and preemptively and falsely informed others that Harrison had voluntarily left Compass to work on a software project.

99.     Nevertheless, Harrison continued to perform tasks on Compass Coffee's behalf, including those which Michael required as part of the termination of his job responsibilities.

**Harrison's Exercise of his Right to a Buyout Goes Unanswered**

100.    Pursuant to Compass's operating agreement, upon his termination, Harrison was entitled to a repurchase of his ownership shares in Compass Coffee.

101.    The Fifth Amended Operating Agreement was in effect at the time of Harrison's termination. The parties to the agreement were Michael Haft, Harrison Suarez, Four Properties LLC, Colby Bartlett LLC, and Hexad LLC. Robert Haft signed on behalf of all of the LLCs.

102.    Section VI.10 of the Fifth Operating Agreement, entitled "Repurchase of Founder Units" states:

VI.10.1     The Founders, Michael Haft and Harrison Suarez ("The Founders") shall each have the option to sell part or all of their Units back to the Company for a period of 120 days from the effective date of termination, for any reason. The Repurchase Price of each Unit shall be the Fair Market Value as determined by a valuation firm (or

accountant, or accounting firm) selected by the Founders, and paid for by the Company. Any repurchase shall be consummated within 30 days after determination of Fair Market Value of Units held by Founders (for the Company as a whole, and without any liquidity discounts, minority discounts, or lack of marketability for a closely held entity. The Company shall not have any right to repurchase Units from the Founders, unless Founders exercise their right to sell part or all of their Units back to the Company.

VI.10.2    The Company shall pay the aggregate Repurchase Price, by wire transfer of same day funds. The Company may not defer any payments due under this provision.

103.    The Fifth Operating Agreement defines "Units" to mean:

the ownership interests in the Company, including Common Units and Preferred Units subscribed for by the Members pursuant to Section 2.1 hereof, whether subsequently held by Members or Unit Holders who are not admitted as Members, including any and all rights to a distributive share of the Profits and Losses of the Company and the Company property, together with all obligations of such Person to comply with the terms and provisions of this Agreement. The Units of the Members are set forth in the Units Register.

104.    The Fifth Operating Agreement defines "Fair Market Value" to mean the value that would be obtained in an arm's length transaction between an informed and willing seller and an informed and willing purchaser, each with an adequate understanding of the facts.

105.    As of the Effective Date of the Fifth Amended Operating Agreement, Harrison held 114,305 Units, comprising a 10.96% ownership stake in Compass Coffee. The parties agreed in Section XI.4 of the Fifth Operating Agreement that Delaware law would govern the application or interpretation of the contract.

106.    On or about November 15, 2021, Harrison provided Michael and Robert—in his role as the Managing Member of the other Compass Coffee Members identified in the Fifth Operating Agreement—with written notice that Harrison was formally and timely exercising his

rights under Section VI.10 of the Fifth Operating Agreement. Consistent with his contractual rights, Harrison requested a fair market valuation of his Units, to be conducted pursuant to a mutually agreed upon method and by a mutually selected evaluator.

107.    Around the same time, Michael demanded that Harrison personally guarantee an additional $1.5 million in SBA grants. He threatened that Harrison would be liable for a $1.5 million loss under the Fifth Operating Agreement if he did not do so. In response, Harrison asked him for proof that Compass Coffee's recent use of approximately $4 million in grant proceeds to prepay convertible notes and invest in a bitcoin play was proper. Michael failed to provide such proof.

108.    On or about December 5, 2021, Harrison therefore notified Compass Coffee's Board of Directors (that is, Michael and Robert) that he believed there was inadequate oversight of Michael and insufficient financial control, such that taking on additional debt was not in the best interests of the Company, at least until those issues were addressed.

109.    The next day, Harrison sent an email to Michael and Robert advising them that, in light of Michael's termination of Harrison's role and responsibilities, he had been unable to perform his duties as a Manager or Member of the Board of Directors since July 2021 and therefore was resigning from the Board of Directors of Compass Coffee.

110.    Harrison followed up with Michael and Robert concerning the contractually required Fair Market Valuation on many occasions thereafter, without success.

111.    The Hafts, however, continued to pressure Harrison to personally guarantee more SBA debt, with Michael expressly tying it to the buyout of Harrison's Units. By example, in March 2022, Michael again threatened Harrison that if he would not assist with the SBA loan application process, there would not be a buyout.

112.    Michael and Compass Coffee have continued to prevent a valuation firm (or accountant, or accounting firm) selected by the Founders (as that term is defined in the Fifth Operating Agreement), and paid for by the Company, from determining the Fair Market Value of Units held by Founders.  They have also refused to consummate the repurchase of Harrison's Units.

113.    Instead, Michael and Compass Coffee have taken steps to make Harrison's Units appear—falsely—to be effectively valueless. For example, in April 2022 Chuck Faunce, a Director, Business Valuation and Litigation Services at Gorfine Schiller Gardyn ("GSG"), Michael's Certified Public Accountants, prepared for Michael a "draft" valuation report (the "Draft Report").

114.    According to Faunce, the Draft Report valued the "invested capital" of Compass Coffee to be approximately $11.5 million, as of December 31, 2021.

115.    After Harrison received a copy of the Draft Report, he expressly asked Faunce what his share of the company was worth. Faunce responded that he interpreted the Draft Report to mean that the value of Harrison's founder's shares was $163,433 absent a liquidation event, and $22,569 in the case of one. In other words, Faunce told Harrison that his stake in the tremendously successful business he co-founded and labored for years to build was worth *less* than the $200,000 Harrison had invested in Compass Coffee years earlier, and worth 0.5% of the more than $34 million that Faunce had valued just the *brand*—not the business itself—to be worth the prior year during the height of the COVID-19 pandemic.

116.    Setting aside the facially absurd conclusion it drew, there were numerous problems with the Draft Report and the entity that prepared it. First, as noted above, the Fifth Operating Agreement required valuation to be done by an independent evaluator mutually selected by the

parties—not unilaterally by Michael. Second, the Fifth Operating Agreement set forth a specific and detailed definition of Fair Market Value, which the Draft Report failed to follow. Third, the Draft Report improperly utilized discounts for lack of marketability and control, which are not permitted by Section VI.10. Fourth, the Draft Report was based on the lesser standard of a "value calculation" and not an actual valuation or appraisal.

117.    Further, GSG expressly admitted in the Draft Report that it relied on the information Michael and Compass Coffee management provided to it without Harrison's input or approval. These inputs simply are not credible. For example, Compass Coffee is projected in the Draft Report to have increasing capital expenditures, a stagnant profit margin, and an immediate "terminal growth rate" that is equivalent to the macro economy; none of these metrics are appropriate for a successfully growing young company like Compass Coffee, nor were they consistent with Compass's actual track record of growth and reinvestment to that point.

118.    This value calculation also relied on the use of a "book value" of the business (i.e., assets less liabilities), where liabilities roughly equaled assets, and thus book value was nil. Liabilities equaled assets because Robert and Michael Haft provided convertible loans to the business through entities they owned and controlled.

119.    Additional inputs that radically reduced the outputs of the value calculation included: inflated tax impact to be borne by Mr. Suarez (and not in compliance with IRS standards), sleights of hand used in cost of capital assumptions (including risk-free rate selection and an inflated equity risk premium), and the estimation of a future 90% equity to 10% debt capital structure that represented a company far more indebted than the company's actual condition, even notwithstanding the Hafts' considerable loans to the business.

120.    Perhaps for this reason, GSG expressly disclaimed the reliability of its own Draft Report, stating, "GSG has not audited, compiled or reviewed this information, and do not express an opinion or any form of assurance on it."

121.    In further demonstration of its unreliability, the Draft Report is inconsistent with both Compass Coffee's affirmative representations concerning its value and the contemporaneous investment offers it received at the time, all of which make clear that Harrison's Units are worth millions of dollars.

122.    For example, on February 7, 2020, an investment firm offered to acquire 14.5% of Compass for $10 million, which results in an enterprise value of $75.2 million. At the time, this investment firm valued Compass at between $5.75 million and $6.25 million per café. At the direction of the Hafts, Compass rejected this offer as too low, countering with a per café valuation of $8.33 million—which implied an enterprise value of nearly $92 million.

123.    In January 2021, Michael represented to prospective investors that the valuation of Compass Coffee was $75 million, citing 2020 Compass revenues as $22 million and 2021 projected revenues as $30 million.

124.    At that time, Compass had 6 cafés in operation, implying a valuation of $12.5 million per café. Compass now has more than 20 cafés.

125.    That $75 million valuation also did not account for Compass's then-emerging consumer-packaged goods business.

126.    In 2022, Michael provided financial data to GSG indicating that in 2021, when Compass Coffee consumer-packaged goods products were in approximately 30 stores, Compass Coffee earned $2.184 million. By 2022, at the time of the valuation, Compass was onboarding its products to more than 250 stores, including Whole Foods and Giant.

127.    At the same time that Michael represented to GSG that Compass's revenue growth was slowing and its financial outlook was weak, he was painting an optimistic picture of a V-shaped recovery both to the SBA and to investors.

128.    On January 31, 2024, Harrison and Michael executed a tolling agreement that tolled the statutes of limitations for any and all rights or claims that had not expired as of July 19, 2021 for the period from July 19, 2021 through July 31, 2024.

<u>**COUNT I**</u>

**(Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) & (d))**
**(All Defendants)**

129.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

130.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

131.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

132.    As explained in detail below, Defendants' years-long misconduct violated RICO Sections §§ 1962(c) and (d).

*Culpable Persons*

133.    Defendants named in this cause of action are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise, as defined in 18 U.S.C. § 1961(4), whereby they engaged in a pattern of racketeering activity for a common illegal purpose in violation of 18 U.S.C. §§ 1962(c) and (d).

*The Haft Family Enterprise*

134.    The "enterprise" as defined in 18 U.S.C. § 1961(4) is an association-in-fact enterprise comprised of Michael Haft, Robert Haft, Compass Coffee LLC, Colby Bartlett LLC, Octa LLC, Hexad LLC, and Four Properties LLC[4] (the "Haft Family Enterprise"), whose purpose was to enrich the Haft family at the expense of its business partners, the federal government, and the general public.

135.    Each of the Defendants operated or managed the affairs of the Haft Family Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

136.    Defendant Michael Haft played a central role in the Haft Family Enterprise. As Harrison's long-time best friend, he exploited this position of trust to induce Harrison to relinquish his ownership interests and control of Compass LLC.

137.    Michael also served as Chief Financial Officer of Compass, and, in that role, was in charge of (1) preparing applications for loans and grants from the SBA and (2) negotiating rent with landlords.

138.    Defendant Robert Haft played the role of managing and organizing each of the LLCs, and concealing their true ownership. For example, he changed the name of MHaft LLC to Octa LLC before that entity appeared on Compass's capitalization table, ensuring its true ownership would stay secret. He also specifically directed Michael to keep this fact concealed from Harrison.

139.    Additionally, Robert served as an advisor to Harrison and Michael as they launched Compass. He had a major financial role in the growth of the business, providing numerous loans.

---

[4] Discovery is likely to reveal additional Haft family LLCs that may be part of the enterprise. For example, National Investment Group LLC provided capital to Compass and may be implicated in the scheme(s).

He also was involved in corporate strategy: for example, he took the lead on recruiting a lawyer to draft Compass's operating agreements. In particular, he initiated and coordinated the drafting of the Second Operating Agreement, which contained the provisions that led to Harrison being forced out of the company. He also developed a deep trust with Harrison on account of treating him like a son for years, and was able to leverage that trust for personal gain later on.

140.    Defendant Compass Coffee LLC played a central role in the Haft Family Enterprise as one of their most public, prominent, and successful LLCs. It applied for and obtained $10.5 million in Covid relief funding from the SBA, painting itself as a model recipient and a model of small business recovery from the pandemic, despite the fact that, even with that massive cash infusion, it failed to pay rent and defaulted on loans.

141.    At all relevant times, Defendants operated as an association-in-fact enterprise, formed for the purpose of engaging in related schemes to defraud Harrison of his share in the growing Compass business, and to appropriate Covid relief funding for personal gain.

142.    The associates in the enterprise function as a continuing unit: they make strategic decisions together, shift assets around amongst themselves, and lead and operate a family of affiliated businesses. The enterprise has existed, with little or no change in its membership, for a long period of time—at least since 2013, around the time when Harrison and Michael launched Compass, and when Michael, Robert, and their LLCs devised the initial funding ruse. Discovery may show it has existed even longer—at every turn Harrison has learned something new about the Haft Family Enterprise's activities, and the Haft family has curtailed Harrison's access to information since they ousted him from Compass.

143.    At all relevant times, the Haft Family Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in

which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Robert Haft, Michael Haft, and all of their LLCs associated for the common purpose of seizing all of Compass's value for themselves and extracting money and assets from business partners and the government.

144.    The Haft Family Enterprise engaged in, and its activities affected interstate commerce, because it involved commercial activities across state borders. Both Compass Coffee and Union Kitchen have locations in Virginia as well as the District of Columbia, as well as consumer packaged goods businesses across the country.

145.    Each participant in the Haft Family Enterprise had a systemic linkage to each other through close personal relationships, financial ties, and continuing coordination of activities. For example, the members of the Haft Family Enterprise trade ownership interests in their various businesses when it benefits them. In one instance, on October 1, 2020, the Hafts transferred Octa LLC's shares of Compass to Michael. The reason for the transfer was to satisfy the SBA's requirements to qualify as a veteran-owned business. Harrison subsequently uncovered other examples of transfers between the Haft entities. For example, in 2020, Robert made several transfers of Four Properties LLC's shares in Union Kitchen to Michael, Colby Bartlett, and Hexad. On information and belief, the purpose of these transfers was to ensure that Four Properties and Colby Bartlett remained below the 20% threshold that would have required them to guarantee Union Kitchen's debt with the SBA.

146.    Through the Haft Family Enterprise, the Defendants functioned as a continuing unit with the purpose of furthering the illegal schemes and their common purposes of enriching themselves and consolidating and appropriating control of their various businesses from business partners.

147.    While the Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, and individual personhood.

148.    The association-in-fact enterprise engaged in lawful activity that is distinct from the pattern of racketeering activity, such as operating the various businesses associated with the Haft family, including Compass Coffee, Union Kitchen, Continuum, and Consensus.

### The Pattern of Racketeering

149.    Defendants knowingly participated, directly or indirectly, in the conduct of the affairs of the Haft Family Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5), and which employed the use of the wire facilities, in violation of 18 U.S.C. § 1343. In doing so, they violated 18 U.S.C. §§ 1962(c) and (d).

150.    The Defendants' predicate acts of racketeering constitute wire fraud. The Defendants violated 18 U.S.C. § 1343 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, and omissions. In furtherance of this scheme, Defendants used the interstate wires.

151.    Beginning in November 2013, the Haft Family Enterprise devised and carried out a scheme to intentionally defraud Harrison by using LLCs to conceal their identities and ownership interests in Compass, in order to exert control and personally enrich themselves (the "Ownership Concealment Scheme"). In furtherance of this scheme, Defendants used the interstate wires.

152.    To effectuate the goals of this scheme, the Haft Family Enterprise made the following materially false and misleading statements and omissions, as described above and below: 1) that Colby Bartlett was equivalent to Robert; 2) that Octa was equivalent to Robert; and 3) that Michael and Harrison were equal partners in the business.

153.    In 2020, the Haft Family Enterprise devised and carried out a scheme to defraud the SBA by misusing Covid relief funds and concealing their improper uses in order to personally enrich themselves (the "Covid Relief Loan Scheme"). In addition, they falsely represented to the SBA that they had spent money on eligible uses in order to induce the SBA to forgive the loans. In furtherance of this scheme, Defendants used the interstate wires.

154.    To effectuate the goals of this scheme, the Haft Family Enterprise made the following materially false and misleading statements and omissions, as described above and below: 1) that Compass would spend its Covid relief funds on permissible uses, including payroll, rent, and other operating expenses; 2) that Compass would settle its debts with its landlords; and 3) in its loan forgiveness application, that Compass had in fact used its relief funds on permissible uses.

155.    Defendants' use of the wires includes several examples, many of which are set forth in more detail above in the factual allegations. As to the ownership concealment scheme, these examples include but are not limited to:

    a.  In a November 2013 email Michael sent to Harrison, Michael referred to "our third partner"—that is, Colby Bartlett LLC, and wrote "[o]ur third partner also happens to be my dad."

    b.  Between November 2013 and March 2014, Michael and Robert, along with Harrison, had numerous telephone and email communications with numerous attorneys for Compass and/or the Haft family about and for the purpose of drafting and executing the First Operating Agreement. The First Operating Agreement depicted the ownership interests in Compass as follows: Michael and Harrison had equal 25% shares of the company, and Colby Bartlett had the

remaining 50%. In all of the communications made in furtherance of enacting this agreement, Robert and Michael omitted the material fact that Michael owned a substantial part of Colby Bartlett, and therefore owned far more than 25% of the company.

c.  On March 29, 2014, Colby Bartlett sent a wire transfer of $250,000 to Compass Coffee, in exchange for its 50% stake in the company.

d.  In a May 7, 2015 email Robert sent to Michael and Harrison, Robert wrote that Colby Bartlett had transferred its 50% interest in Compass to Octa (40%) and Hexad LLC (10%). He omitted the material fact that Michael was the 100% owner of Octa, and that he had in fact just changed Octa's name from MHaft LLC.

e.  On January 14, 2016, Robert emailed Michael and Harrison to advise them to revise their operating agreement. He attached a draft revised operating agreement that his lawyer had prepared. The contribution table in the revised draft listed the ownership percentages as 25% Harrison, 25% Michael, and 50% Octa LLC. Again, he omitted the material fact that Octa was Michael, and that Harrison and Michael did not actually have equal shares.

f.  On or about August 2, 2018, Michael sent messages to Harrison via Trello, Compass's task management software, for the purpose of executing a transfer agreement to each transfer their 50% stake in Haft Suarez LLC over to Compass Coffee LLC. In particular, Michael asked Harrison to sign the agreement. Michael and Compass failed to disclose the material fact that Michael and Harrison were not equal partners in Compass Coffee LLC.

156.    As to the Covid Relief Scheme, Defendants' uses of the wires include, but are not limited to, the following examples:

a.  On May 3, 2021, Compass Coffee LLC and Michael submitted a funding application to the SBA for the Restaurant Revitalization Funding grant. Compass and Michael indicated on the application that funds would be spent on business payroll costs and rent, as well as other permissible operating expenses. Michael failed to disclose the material fact that he and Robert intended to use the influx of cash to make risky investments and pre-pay debt to themselves.

b.  Between April 2020 and July 2021, Michael and Harrison spoke frequently by telephone regarding plans for how to use the Covid relief funds, sometimes multiple times per day. Robert occasionally joined these calls as well. Michael represented that he planned to (i) use the money for operating expenses including payroll and rent, (ii) start paying rent again after Covid rent abatements, and (ii) settle outstanding debts with landlords. Michael and Robert failed to disclose the material fact of their actual plans for the money.

c.  On May 21, 2021, Michael texted Harrison a draft plan for how the upcoming SBA funds would be used. He failed to disclose the material fact that Michael intended to use the funds for a bitcoin investment and the pre-payment of debt, and not for payment of rent.

d.  In an article published by the Washington Business Journal on July 12, 2021, Michael falsely reported that Compass had not yet received its $6.8 million RRF grant, despite the fact that it had received the funds in May. Michael knew or

reasonably should have anticipated that the article would be transmitted through the interstate wires.

e.   In a video published by the SBA on January 14, 2022, Michael stated that SBA Covid relief funds had been used on payroll, retraining employees, and otherwise as working capital to keep the business running. He failed to disclose the material fact that Compass in fact spent $4.1 million on impermissible uses. Michael knew or reasonably should have anticipated that the video would be transmitted through the interstate wires.

157.    These acts constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1).

158.    For the purpose of executing the two illegal schemes, Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

159.    The Haft Family Enterprise has been operating continuously for over ten years.

160.    The above-described racketeering activities amounted to a common, ongoing course of conduct intended to deceive and harm Plaintiff and the SBA.

161.    Each instance of racketeering was related, had a common purpose, was carried out with similar participants and methods, and affected Plaintiff in the same manner. Defendants' racketeering acts extended over a substantial period of time—at least nine years. Plaintiff continues to have personal guarantees on large amounts of Compass debt and is still at present a Compass shareholder, and Defendants continue to operate (and control) Compass Coffee LLC, Union Kitchen, and other businesses. The racketeering activities therefore constitute a continuing threat to Plaintiff and others similarly situated.

162.    Fraudulent misrepresentations and, in particular, using LLCs to conceal ownership interests, are part of the Haft Family Enterprise's ordinary way of doing business, and therefore pose a threat of continued unlawful activity to business partners as well as the government.

163.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Defendants agreed to facilitate the operation of the Haft Family Enterprise through the above-described pattern of racketeering and through perpetrating the above predicate acts. Various other third-party entities and individuals not named as defendants in this Complaint have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to enrich the Haft family throughout the illegal scheme and common course of conduct.

164.    As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of deceptively using LLC entities and their supermajority control over them to personally enrich the Hafts at the expense of Harrison, others like him, and the SBA. But for Defendants' fraudulent scheme and racketeering, Plaintiff would not have signed over his interest in the brand, and faced lawsuits and legal threats over defaulted debts, causing him to incur costs.

***Causation and Damages***

165.    As a direct and proximate result of Defendants' violation of 18 U.S.C. §§ 1962(c) and (d), Plaintiff suffered substantial injury to his business and/or property, including but not limited to injuries incurred in connection with being (i) fraudulently induced into assigning his 50% ownership share of the Compass brand over to Compass LLC for no compensation at all,

based on Defendants' misrepresentations that he and Michael were equal owners of Compass LLC; and (ii) personally sued and forced to incurred legal fees in disputes over debts he jointly and severally guaranteed alongside Michael, as a direct result of Defendants' failure to pay their debts and misrepresentations to Harrison that they were using SBA funds to do so.

166.    By virtue of these violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiff is entitled to recover treble damages, costs and attorneys' fees from Defendants and such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### (Fraud)
### (Defendants Michael Haft and Robert Haft)

167.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

168.    Defendants Michael Haft and Robert Haft, despite a duty to be truthful, intentionally and/or negligently misrepresented to Harrison that he and Michael were equal partners in Compass Coffee LLC as part of their fraudulent scheme to defraud Harrison into relinquishing his 50% ownership of the Compass brand intellectual property. Specifically, they represented to Harrison that Colby Bartlett LLC and Octa LLC were both equivalent to Robert Haft, when in fact these LLCs concealed Michael's outsized ownership share of the company. Additionally, Michael repeatedly and explicitly stated to Harrison that he and Harrison were "equal partners."

169.    The Compass brand intellectual property was valued at $34 million by the Haft's own family accountant in 2020. As detailed above, the brand has since significantly expanded and has greater recognition, including nationwide.

170.    Harrison would not have assigned his 50% share of HaftSuarez over to Compass for $0 consideration but for the Hafts' repeated misrepresentations and omissions that led Harrison to believe he was an equal partner in the business and that his financial interest in Compass was secure.

171.    The Hafts knew these material misrepresentations and omissions were false when they made them.

172.    Michael and Robert intended to induce Harrison to rely on the misrepresentations.

173.    Harrison justifiably relied on the misrepresentations.

174.    As a direct and proximate result of Defendants' fraudulent actions and representations, Plaintiff has suffered injuries to his business, property and finances, including but not limited to the loss of his 50% interest in the Compass brand intellectual property.

## COUNT III

### (Breach of Contract)
### (All Defendants)

175.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

176.    Michael Haft, Harrison Suarez, Four Properties LLC, Colby Bartlett LLC, and Hexad LLC entered into the Fifth Amended Operating Agreement on or about November 10, 2020. Robert Haft was the signatory for all three LLCs.

177.    The Fifth Operating Agreement is a valid and enforceable contract.

178.    Harrison performed and fulfilled his obligations under the Fifth Operating Agreement.

179.    Defendants have breached, and intend to breach, the Fifth Operating Agreement, without contractual excuse or justification, by, among other things, violating Section VI.10.

180.    Defendants breached Section VI.10 of the Fifth Operating Agreement by failing to use reasonable best efforts to consummate the repurchase of Harrison's founders shares as contemplated

by Section VI.10, refusing to repurchase his shares without any basis for taking such action under the Fifth Operating Agreement or applicable law, and not paying Harrison the Fair Market Value of his Units (as those terms are defined in the Fifth Operating Agreement).

181.    As a direct and proximate result of Defendants' breaches of the agreement, Harrison has been damaged.

182.    In Section XI.18 of the Fifth Operating Agreement, the parties acknowledged that it would be "impossible to measure, in money, the damages that shall accrue to a party or to the personal representative of a decedent from a failure of a party to perform any of the obligations under this Agreement," and thereby expressly "waive[d] the claim or defense that the moving party or representative has or shall have an adequate remedy at law"; and agreed that  they "shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists."

183.    Harrison has been harmed and will continue to be irreparably harmed if Defendants refuse to comply with their contractual obligations to use reasonable best efforts to consummate the repurchase of Harrison's founders shares as contemplated by Section VI.10 of the Fifth Operating Agreement.

184.    Defendants are contractually obligated to abide by Section VI.10 of the Fifth Operating Agreement, and they will not be harmed if they are prevented from violating Harrison's contractual rights. By contrast, Harrison has been and will continue to be irreparably harmed. The balance of the equities weighs in Harrison's favor, and he has no adequate remedy at law.

185.    In the alternative, Harrison seeks money damages from Defendants, in an amount to be proven at trial, plus prejudgment interest.

## COUNT IV

### (Breach of the Duty of Good Faith and Fair Dealing)
### (All Defendants)

186.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

187.    The Parties entered into the Fifth Amended Operating Agreement on or about November 10, 2020.

188.    By entering into the Fifth Amended Operating Agreement, Defendants impliedly covenanted that the Parties would act in good faith to bring about the repurchase of Harrison's Units.

189.    Defendants have not acted in good faith.

190.    In the alternative, Defendants' breach of the covenant of good faith and fair dealing has deprived Harrison of the benefit of their bargain and caused Harrison to suffer substantial harm.

191.    As a direct and proximate result of Defendants' breaches of the agreement, Harrison has been damaged.

## COUNT V

### (Breach of Fiduciary Duty of Loyalty and Care Under D.C. Code § 29–804.09 and Common Law)
### (Defendants Michael Haft and Robert Haft)

192.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if separately set forth herein.

193.    Members of an LLC owe fiduciary duties to both the LLC and to the other members. Michael Haft and Robert Haft therefore owed Harrison a fiduciary duty of loyalty and care.

194.    Michael and Robert failed to act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner that Michael and Robert reasonably believed to be in Harrison's and Compass's best interests.

195.    Many of Michael's and Robert's actions as pled herein constitute willful and intentional misconduct and knowing violations of D.C. law, federal law, and common law as pled herein. In the alternative, such actions constituted gross negligence and/or reckless conduct.

196.    Michael and Robert breached their duty of loyalty and care to Harrison when they failed to disclose material facts concerning Compass's true ownership, induced Harrison to assign away his 50% interest in Compass's brand for no consideration, refused to fairly value Harrison's share in the Company, refused to effectuate the repurchase of Harrison's Units at fair market value, misused Covid relief funds without Harrison's knowledge, and engaged in other misconduct designed to enrich themselves at the expense of Harrison and Compass.

197.    The Hafts' breach of their fiduciary duty of loyalty and care proximately caused injury to Harrison as pled herein.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment and relief against Defendants, as follows:

A.    Award compensatory damages to Plaintiff in an amount to be established at trial;

B.    Award treble damages as permitted by law;

C.    Award pre- and post- judgment interest;

D.    Award reasonable attorneys' fees and costs;

E.    Order Defendants to perform their obligations under Section VI.10 of the Fifth Operating Agreement and repurchase Harrison's Units for Fair Market Value in accordance therewith;

F.  In the alternative, order Defendants to pay Harrison compensatory damages for their breach of Section VI.10 of the Fifth Operating Agreement, in amount to be determined at trial, plus interest thereon; and

G.  Grant Plaintiff such other and further relief as may be deemed just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of the claims asserted herein.

Dated: January 13, 2025                                      Respectfully Submitted,

By: */s/ Kathryn Ali*
    Kathryn Ali (D.C. Bar No. 994633)
    Elizabeth Lockwood (D.C. Bar No. 1029746)
    Meghan Palmer (D.C. Bar No. 1736144)
    ALI & LOCKWOOD LLP
    501 H Street NE, Suite 200
    Washington, D.C. 20002
    (202) 651-2475
    katie.ali@alilockwood.com
    liz.lockwood@alilockwood.com
    meghan.palmer@alilockwood.com

    *Attorneys for Plaintiff Harrison Suarez*