**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HARRISON SUAREZ,<br><br>*Plaintiff*,<br><br>v.<br><br>COMPASS COFFEE LLC, *et al.*,<br><br>*Defendants*. | Civil Action No. 25‑89 (SLS)<br><br>Judge Sparkle L. Sooknanan |

## <u>MEMORANDUM OPINION</u>

Harrison Suarez and Michael Haft are two former Marines who turned their shared loved of coffee into what is now a popular and thriving D.C. business, Compass Coffee. Unfortunately for Mr. Suarez, the American business fairy tale he thought he was living proved too good to be true. Mr. Suarez alleges that Michael and his father Robert Haft spent years deceiving him into believing that they viewed him as a member of their family, that he was an equal partner in the company he and Michael created, and that they had his best interests at heart. In reality, however, the Hafts were working without his knowledge to dilute his ownership interest, deprive him of the value he had created in Compass through years of labor, and ultimately force him out of the company entirely. Along the way, Mr. Suarez alleges, the Hafts also defrauded the Small Business Administration, obtaining COVID-19 relief funds that they spent for improper purposes rather than making payments on Compass debts and property leases that Mr. Suarez had personally guaranteed—leading to lawsuits against Mr. Suarez.

Mr. Suarez filed this lawsuit alleging that the years-long pattern of fraudulent activity perpetrated by the Hafts and Compass Coffee violates the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. He also brings state law claims of fraud, breach

of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty. The Defendants have moved to dismiss and for partial summary judgment. For the reasons explained below, the Court finds that all of Mr. Suarez's claims survive dismissal except for his breach of contract claim against Robert Haft. And it finds that the Defendants' pre-discovery summary judgment motion is premature.

## BACKGROUND

### A.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Harrison Suarez and Michael Haft[1] met as college students and became close friends while serving in the United States Marine Corps. Compl. ¶ 2, ECF No. 1. While stationed at Camp Lejeune in North Carolina, and later while deployed to Afghanistan, the two bonded over their shared love of coffee. Compl. ¶¶ 26–27.

Upon returning from Afghanistan, and with the help of a loan from Michael's father Robert, Harrison and Michael moved into a house together in North Carolina and "devoted themselves to learning everything they could about coffee." Compl. ¶ 28. When their military service ended, they decided to explore if they could turn their shared passion into a way to make a living. *Id*. They moved to Washington, D.C., where Harrison lived in the Haft family home. *Id*. They co-authored a best-selling e-book called *Perfect Coffee at Home*. Compl. ¶ 29. And they formed their first limited liability company (LLC), HaftSuarez, of which each owned 50%. *Id*.

---

[1] In this Factual Background section, the Court refers to the Parties by their first names to avoid confusion between Michael and Robert Haft. Otherwise, the Court refers to the Parties by their last names using first names when necessary for clarity.

Encouraged by the success of their e-book, Michael and Harrison decided to launch a brick-and-mortar business. Compl. ¶ 30. They formed Compass Coffee as a Delaware LLC in November 2013, *id.*, and they opened their first flagship roastery in the Shaw neighborhood of Washington, D.C. in September 2014, Compl. ¶ 34. From the launch of that first roastery, Compass proved to be "wildly successful." Compl. ¶ 36. Marketed as a business "founded by two Marines" who wanted to create "great coffee" and enrich their local community, Compl. ¶¶ 33, 36, Compass expanded to "more than 20 cafes," Compl. ¶ 37. Compass also developed and scaled a "consumer-packaged goods business" that has become "even more profitable" than its cafes. Compl. ¶ 38.

Throughout Compass's rise, Michael's father Robert played an instrumental role. Unlike Harrison, who "has middle-class beginnings," the Hafts are a "prominent Washington, D.C. family with significant business holdings" that enabled Robert to "support the development of Compass Coffee" and play a "large role in both funding and management of the business." Compl. ¶ 31. As a result, Harrison and Robert "grew close" in Compass's early years. Compl. ¶ 32. Robert acted as a "protector and benefactor of Harrison and Michael, teaching them the ways of entrepreneurship." *Id*. During this period, Robert and Michael also "routinely represented to Harrison that they viewed him as a member of their family" with "Robert impress[ing] upon Harrison that he was grateful for Harrison's service to his country and his loyalty and friendship to Michael, and that he saw Harrison as his own son." Compl. ¶ 4. Harrison, meanwhile, "had complete trust" that the Hafts "had his best interests at heart." *Id*. He lived frugally and did not take compensation from Compass "all in an effort to maximize its resources, spur on its success, and derive the greatest financial value to himself, Michael, and his coworkers in the long run." Compl. ¶ 35.

3

While Michael and Robert represented to Harrison that he was an equal partner in Compass, in reality he was not. Compl. ¶ 5. When Michael and Harrison first formed Compass in 2013, they made "equal cash contributions of $100,000, and they each—according to Compass's first operating agreement—owned 25% of the business." Compl. ¶ 40. The remaining 50% was owned by Colby Bartlett LLC, which Harrison believed was "wholly owned" by Robert Haft. Compl. ¶¶ 45, 41. Harrison had good reason for this belief. When he and Michael had purchased their shared North Carolina house, Michael had represented that "Colby Bartlett was equivalent to his father," writing in an email that his and Harrison's "mortgage lender (Colby Bartlett) insists that he is happy to lose money on our house." Compl. ¶ 45. Similarly, after Harrison and Michael launched Compass, in which Colby Bartlett took a 50% stake, Michael emailed Harrison referring to their "third partner [who] also happens to be my dad ;)." *Id*.

Robert affirmed the impression left by Michael's misrepresentations by repeatedly representing to Harrison that he (through the vehicle of Colby Bartlett) was providing financial support for Compass "out of gratitude for Harrison's devoted, long-time friendship to Michael" and because it was the "least he could do" to thank Harrison and Michael for their service to the country. Compl. ¶ 46. Robert also advised Harrison and Michael, in his role as mentor and benefactor, to "follow his approach of setting up single-owner, single-member LLCs to own their shares in Compass." Compl. ¶ 47. He represented that Colby Bartlett was exactly that—"a legal fiction that was essentially Robert himself." *Id*. In fact, however, Colby Bartlett and Robert were not one and the same. Robert owned only 4% of the LLC and the remaining 96% was owned by Michael and his siblings. Compl. ¶ 42. This meant that from the very beginning—when Colby Bartlett took a 50% stake in Compass—Michael's ownership share in Compass was much larger than Harrison's 25%. *Id*.

In the years that followed, the Hafts engaged in further deceptions to exacerbate the disparity between Michael and Harrison's ownership interests. In May 2015, Robert emailed Michael and Harrison to tell them that Colby Bartlett had transferred its 50% interest in Compass to Octa LLC (40%) and Hexad LLC (10%). Compl. ¶ 43. As with Colby Bartlett, Harrison believed these entities were controlled by Robert. *Id*. In fact, however, Octa was 100% owned by Michael and until the month before the transfer had been named "MHaft LLC"—a name Robert changed in April 2015 presumably to conceal the LLC's true ownership from Harrison. *Id*. Because of this deception, Harrison continued to believe he was an equal partner in Compass when Michael actually owned 75% of the company.[2] *Id*.

The Hafts also persistently misrepresented that Michael and Harrison were equal partners in Compass through Compass's periodically revised operating agreements and in "numerous telephone and email communications" that Michael, Harrison, and attorneys for Compass and the Haft family had about the agreements. Compl. ¶¶ 50, 155. Compass's first operating agreement reflected that Harrison and Michael each held 25% of the company while Colby Bartlett held 50%. Compl. ¶ 49. Its second operating agreement—which was primarily drafted by Robert with help from the "Haft family lawyer"—reflected the same 25% shares for Harrison and Robert with Octa now owning Colby Bartlett's 50% interest. *Id*. As discussed above, however, Michael partly owned Colby Bartlett (along with his siblings), and he was the 100% owner of Octa. Compl. ¶¶ 42–43. These contribution tables thus seem to have been "false and deliberate" misrepresentations "designed to deceive Harrison into thinking he was still on equal footing with Michael." Compl. ¶ 49. Michael's ownership interests in Colby Bartlett and Octa were further disguised by the fact

---

[2] Despite Robert's representation that some portion of Colby Bartlett's interest was being transferred to Hexad, it actually all went to Octa. Compl. ¶ 49 n.3.

that Robert "was the signatory for both Colby Bartlett LLC and Octa LLC in Compass documents, including the first three operating agreements." Compl. ¶ 48.

According to Harrison, his misperception that he remained an equal partner with Michael cost him dearly. Compl. ¶ 52. Based on the "belief that he had equal equity in a growing and thriving business, Harrison poured time, energy, and money into the company, and shouldered equal burdens with Michael." *Id.* He worked full-time for Compass for years without taking a salary. Compl. ¶ 53. He invested an additional $100,000 into the company in 2019, "ultimately investing all of his savings from his military service." *Id.* He agreed to "personally guarantee many leases and debts equally with Michael, including at least $24 million in rent on Compass facilities." Compl. ¶ 54. And he agreed to "harsh provisions" in Compass's operating agreements—including that "Compass could terminate [him] at any time"—on the assurance that Michael was subject to the same terms. Compl. ¶ 56. Michael, of course, was "never actually exposed to the same risk of termination, because he was already the supermajority owner of Compass." Compl. ¶ 56.

Worst of all, Harrison agreed to "assign[ ] his 50% interest in the Compass brand to Compass Coffee LLC for no consideration ($0), again relying on the Hafts' misrepresentation that he had an equal share in Compass to Michael." Compl. ¶ 59. Up until this assignment, which occurred in August 2018, the Compass brand had been owned by HaftSuarez LLC, the original company Michael and Harrison created of which each owned 50%. *Id.* In 2020, "the Haft family accountant valued the brand at $34 million." *Id.*

It was not until one month *after* the brand transfer, in September 2018, that Harrison "inadvertently discovered Octa's true ownership" while reviewing documents related to a loan. Compl. ¶ 60. When Harrison confronted Michael about his ownership of Octa, Michael admitted that he had concealed the nature of the LLC's ownership "at the direction of his father." *Id.*

6

Harrison knew that "Robert cared deeply about privacy, and he attributed the secrecy around Octa to those concerns." Compl. ¶ 61. Harrison also still believed—based on his years-long working and professional relationship with Michael and Robert—that the Hafts still had his "best interests at heart" and that this was "an isolated breach of trust." *Id*. It was not until 2022, after his termination, that Harrison discovered Colby Bartlett's true ownership and understood that "Michael had secretly had a larger share of the business *since day one*." Compl. ¶¶ 61, 63. The Hafts, he finally realized, had been lying to him all along "to manipulate him into relinquishing ownership and authority in Compass."[3] Compl. ¶ 61.

In 2020, the COVID-19 pandemic hit Compass hard. "Sales declined precipitously, and Harrison and Michael had to lay off 80% of their team." Compl. ¶ 64. Compass eventually applied for and received $10.5 million in COVID-19 relief funds in the form of loans and grants from the Small Business Administration (SBA). Compl. ¶ 67. These funds came with various restrictions on how they were to be used and were intended to help Compass "pay the Company's bills during the crisis, including payroll, rent, and other designated operating expenses." Compl. ¶¶ 66, 73–76.

At the time, Michael was the Chief Financial Officer for Compass and worked closely with his father to manage the company's finances. Compl. ¶ 65. Not long after Compass began receiving the COVID-19 relief funds, Michael and Robert began diverting them for "impermissible uses and personal gain." Compl. ¶ 77. In October 2021, they used $2 million in relief funds to "pre-pay" themselves back for convertible notes (i.e., loans) they had made to Compass even though those notes were not due until July 2022. Compl. ¶ 78. They put another $2.1 million of Compass's relief funds towards an unrelated bitcoin investment. Compl. ¶¶ 80, 156. And they

---

[3] Harrison discovered Colby Bartlett's true ownership from its certificate of formation, which Michael had uploaded to the company shared drive in March 2020. Compl. ¶ 63.

withdrew an additional $2 million from Compass's accounts (which had been replenished by the COVID-19 relief funds) and invested it in another food-related business venture. Compl. ¶ 79.

All these expenditures were contrary to affirmations made by Michael and Compass on their funding applications promising to use any funds awarded for "permissible purposes." Compl. ¶ 81. They were also contrary to representations Michael and Compass made to Harrison and others about how the funds would be spent. *Id.* In a video posted on the SBA website in January 2022, for example, Michael and other Compass employees reported that they had "used SBA funds to keep people employed, to retrain employees, and to keep the business running." *Id.* Most relevant to Harrison, Michael repeatedly represented that he would use the influx of cash to pay off deferred rent obligations and get current on the many Compass property leases that Harrison had "personally guaranteed." Compl. ¶¶ 82–85.

But Michael did not pay rent as he had promised. Compl. ¶ 85. By January 2022, Compass was more than $1.4 million behind on its rent obligations. *Id.* And eventually, Compass's landlords began taking action. Some of them came after Harrison personally because he had "jointly and severally guaranteed Compass's leases equally with Michael." Compl. ¶¶ 87–89, 92. One landlord sued Harrison over Compass's default on rent at 1401 Okie St NE. Compl. ¶ 87. Harrison incurred "thousands of dollars in legal fees" before the suit ultimately settled, and he was never reimbursed by Compass for those expenses. *Id.* Harrison also received a demand letter related to unpaid rent at 3208 Ballston Quarter. Compl. ¶ 88. And he later learned that Compass was "$250,000 in arrears" on its lease at 655 New York Avenue NW. *Id.*

In addition to rent, Compass defaulted on other debts Harrison had personally guaranteed. Compl. ¶ 89. In September 2022, Harrison received notice that Compass had violated the terms of

a $5 million loan received from Eagle Bank "due to failure to maintain sufficient collateral." Compl. ¶¶ 89, 54. He received a second default notice in January 2023. Compl. ¶ 89.

As Compass struggled to survive the pandemic, the relationship between Michael and Harrison began to deteriorate. By spring 2021, Harrison had grown frustrated and concerned about "his role and stake in Compass." Compl. ¶ 94. He worried that his ownership interest was being continually diluted, that he was not being adequately compensated, and that he was increasingly being sidelined in decision making. *Id*. He also was beginning to question whether Michael—"whom Harrison had once seen as his closest friend"—had his best interests in mind. *Id*. Harrison raised these concerns with Michael in conversation and in writing, hoping he could salvage their relationship. Compl. ¶¶ 95–96. But the relationship was beyond saving.

On July 19, 2021, Michael advised Harrison by email that he did not "see a path where [they could] continue at Compass together" and thus wanted "to begin the process of separating [their] business relationships." Compl. ¶ 97. Shortly thereafter, Michael locked Harrison out of Compass's office, removed him from the company's systems, and "preemptively and falsely informed others that Harrison had voluntarily left Compass to work on a software project." Compl. ¶ 98.

At the time of Harrison's termination, Compass was operating under its "Fifth Amended Operating Agreement." Compl. ¶ 101. The parties to that agreement, in addition to Harrison and Michael, were Four Properties LLC, Colby Bartlett LLC, and Hexad LLC. *Id*. Robert Haft signed on behalf of the three LLCs. *Id*. That agreement provided that for 120 days after his termination, Harrison was entitled to have his ownership shares in the company repurchased by Compass at a "Fair Market Value as determined by a valuation firm . . . selected by the Founders, and paid for by the Company." Compl. ¶ 102. The Fair Market Value was defined to mean "the value that

would be obtained in an arm's length transaction between an informed and willing seller and an informed and willing purchaser, each with an adequate understanding of the facts." Compl. ¶ 104.

On November 15, 2021, Harrison notified Michael and Robert—"in his role as the Managing Member of the other Compass Coffee Members identified in the Fifth Operating Agreement"—that he was exercising his rights to have his ownership units repurchased. Compl. ¶ 106. At the time, Harrison held a 10.96% ownership stake in the company and requested that a fair market valuation of that interest be conducted by a mutually selected evaluator as required by the Fifth Amended Operating Agreement. Compl. ¶¶ 105–06.

Instead of agreeing on a valuator with Harrison, Michael Haft solicited a "draft" valuation from the Haft family accountant, Chuck Faunce at Gorfine Schiller Gardyn (GSG). Compl. ¶ 113. That draft report found that the "invested capital" of Compass was worth approximately $11.5 million as of December 31, 2021. Compl. ¶ 114. And Faunce calculated, based on that report, that Harrison's "founder's shares" were worth $163,433—nearly $40,000 less than the $200,000 Harrison had invested in Compass years earlier. Compl. ¶ 115.

In calculating Compass's value, GSG relied on information that Michael and Compass management provided without Harrison's input or approval and that was "not credible." Compl. ¶ 117. The calculations assumed, for example, that Compass would have "increasing capital expenditures, a stagnant profit margin, and an immediate 'terminal growth rate' that is equivalent to the macro economy." *Id*. None of these inputs made sense for a "successfully growing young company" with "Compass's actual track record of growth and reinvestment." *Id*. These inputs and GSG's conclusions were also inconsistent with Compass's "affirmative representations concerning its value" and with "contemporaneous investment offers" it had received from third parties. Compl. ¶ 121.

In February 2020, for example, an investment firm had offered to acquire 14.5% of Compass for $10 million, suggesting an enterprise value of $75.2 million. Compl. ¶ 122. The offer valued each of Compass's cafés at between "$5.75 million and $6.25 million." *Id*. The Hafts directed Compass to reject this offer as "too low," countering that each café was more appropriately valued at $8.33 million—implying an enterprise value of nearly $92 million. *Id*. Indeed, that same year, during the height of the COVID-19 pandemic, GSG had valued solely the Compass brand (not the business itself) at $34 million. Compl. ¶ 115.

Similarly, in January 2021, Michael represented to prospective investors that Compass should be valued at $75 million (*i.e.*, $12.5 million for each of Compass's then 6 cafes), which did not account for Compass's "then-emerging consumer-packaged goods business." Compl. ¶¶ 123–25. That non-café part of the business had earned $2.184 million in 2021 when Compass products were sold in approximately 30 stores. Compl. ¶ 126. At the time of GSG's valuation in 2022, Compass was onboarding products to "more than 250 stores, including Whole Foods and Giant." *Id*.

Given this context, Harrison is convinced that his ownership shares are worth "millions of dollars"—not the roughly $160,000 suggested by GSG's draft valuation—and that the Hafts and Compass have continued to prevent the contractually required proper valuation from being conducted to deprive him of value in the company that he spent years laboring to create. Compl. ¶¶ 112, 115, 120–21. On January 31, 2024, Harrison and Michael signed a tolling agreement that "tolled the statutes of limitations for any and all rights or claims that had not expired as of July 19, 2021 for the period from July 19, 2021 through July 31, 2024." Compl. ¶ 128.

## B.    Procedural Background

Mr. Suarez filed this lawsuit on January 13, 2025. He brings claims against Michael Haft, Robert Haft, and Compass Coffee for violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d) (Count I), breach of contract (Count III), and breach of the duty of good faith and fair dealing (Count IV). Harrison also brings claims against the Hafts for fraud (Count II) and breach of fiduciary duty (Count V). On March 18, 2025, the Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts I, II, IV, and V in their entirety and Count III (for breach of contract) as to Robert Haft. ECF No. 11. The Defendants additionally moved for partial summary judgment on Count III under Federal Rule of Civil Procedure 56, ECF No. 12, and to stay discovery, ECF No. 13. All three motions are fully briefed and ripe for review. *See* Pl.'s Opp'n Mot. Dismiss, ECF No. 22; Defs.' Reply Supp. Mot. Dismiss, ECF No. 23; Pl.'s Opp'n Mot. Partial Summ. J., ECF No. 16; Defs.' Reply Supp. Mot. Partial Summ. J., ECF No. 18; Pl.'s Opp'n Mot. Stay Disc., ECF No. 17; Defs.' Reply Supp. Mot. Stay Disc., ECF No. 19.

## LEGAL STANDARD

Under Rule 12(b)(6), a court must dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (cleaned up). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an "inference[] . . . unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (cleaned up).

Rule 9(b) requires that a court dismiss claims for fraud that do not "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading

standard "discourages the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude," while also guaranteeing "all defendants sufficient information to allow for preparation of a response." *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (cleaned up).

Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Additionally, if the non-movant shows that "it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

## DISCUSSION

The Court finds that all but one of Mr. Suarez's claims (his breach of contract claim against Robert Haft) are sufficiently pleaded to survive dismissal, that summary judgment as to Count III is not warranted at this early stage, and that the Defendants' Motion to Stay Discovery is now moot. The Court will address each of the Defendants' three motions in turn.

## I.    Motion to Dismiss

The Defendants move to dismiss Counts I, II, IV, and V in their entirety, and Count III as to Robert Haft. The Court dismisses Count III as to Robert Haft but will permit Mr. Suarez's other claims to proceed.

A.    **RICO (Count I)**

Mr. Suarez alleges a violation of the federal RICO statute, 18 U.S.C. §§ 1962(c) & (d). Compl. ¶¶ 129–66. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d), as relevant here, makes it unlawful for "any person to conspire to violate" Section 1962(c). 18 U.S.C. § 1962(d).

Congress's "declared purpose" in enacting RICO was to support "the eradication of organized crime." *United States v. Turkette,* 452 U.S. 576, 589 (1981) (cleaned up). The statute's reach, however, "is not limited to 'mobsters and organized criminals.'" *Adler v. Loyd*, 496 F. Supp. 3d 269, 278 (D.D.C. 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985)). It extends even to "respected and legitimate enterprises," which "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences." *Sedima*, 473 U.S. at 499.

To state a RICO claim, a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. *Adler*, 496 F. Supp. 3d at 278 (D.D.C. 2020) (citing *Salinas v. United States*, 522 U.S. 52, 52 (1997)). Here, Mr. Suarez alleges that the "Haft Family Enterprise"—composed of Michael and Robert Haft, Compass Coffee LLC, and various LLCs under the Haft family's control, including Colby Bartlett and Octa, Compl. ¶ 134—engaged in a pattern of fraudulent conduct aimed at personally enriching the Hafts at the expense of Mr. Suarez and the SBA, Compl. ¶ 164.

The Defendants challenge Mr. Suarez's RICO claim in three ways. They assert (1) that Mr. Suarez has not alleged a pattern of activity that is covered by the RICO statute, (2) that he has no standing to sue over the Defendants' allegedly fraudulent use of COVID-19 relief funds because

he was not harmed by that conduct, and (3) that any RICO claim is time-barred in any event. The Court finds none of these arguments persuasive.

### 1.     Pattern of RICO Activity

The RICO Act defines a "pattern of racketeering activity" as "requiring the commission of at least two predicate racketeering offenses over a ten[-]year period." *W. Assocs. Ltd. P'ship, v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001). The predicate offenses covered by the statute include wire fraud, *id.* (citing 18 U.S.C. § 1961(1)(B)), which involves the use of interstate communications systems, such as phones, emails, or the internet, to execute a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343.

"The Supreme Court has interpreted the pattern requirement to include two additional elements: relatedness and continuity." *W. Assocs.*, 235 F.3d at 633 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Relatedness means that the predicate acts alleged share "similar purposes, results, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240). And continuity means that the predicate acts constitute "a closed period of repeated conduct" or by their nature pose a future "threat of repetition." *H.J. Inc.*, 492 U.S. at 241.

The D.C. Circuit has identified six additional factors to consider in assessing whether a RICO pattern has been sufficiently alleged: "the number of unlawful acts, the length of time over which the acts were committed, the similarly of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *W. Assocs.*, 235 F.3d at 633 (quoting *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995)). These factors, however, are a "flexible guide" for a RICO pattern analysis and not a "rigid test."

*Id.* at 634. Courts must take a "case-by-case, fact-specific approach" in assessing the viability of every RICO claim. *Id.* at 637.

Finally, RICO claims based on mail and wire fraud "receive[] careful scrutiny 'because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Adler*, 496 F. Supp. 3d at 279 (quoting *W. Assocs.*, 235 F.3d at 637). This caution stems from the fact that "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *W. Assocs.*, 235 F.3d at 637. Accordingly, plaintiffs must plead such "fraud with particularity under Rule 9(b)." *Adler*, 496 F. Supp. 3d at 279. "This rule 'normally . . . means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Bridges v. Lezell L., PC*, 842 F. Supp. 2d 261, 265 (D.D.C. 2012) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)). Applying the pattern requirement in this fashion helps "prevent ordinary business disputes from becoming viable RICO claims . . . simply because the parties used the United States mails" or interstate wires to "transmit contested financial documents." *W. Assoc.*, 235 F.3d at 637.

Here, Mr. Suarez has plausibly alleged a pattern of RICO activity. As an initial matter, the Complaint identifies at least eleven instances of wire fraud that span roughly a decade. *See* Compl. ¶¶ 155–56 (detailing examples of wires between November 2013 and January 2022). This easily satisfies the statutory minimum of pleading "at least two predicate racketeering offenses over a ten[-]year period." *W. Assocs.*, 235 F.3d at 633.

The Complaint also plausibly alleges that the eleven acts are sufficiently related, and satisfy the continuity requirement by constituting, at minimum, a "closed period of repeated conduct." *H.J. Inc.*, 492 U.S. at 241. Specifically, Mr. Suarez alleges that the predicate acts furthered two

distinct but related schemes. First, beginning in November 2013, the Hafts and Compass "devised and carried out a scheme to intentionally defraud [Mr. Suarez] by using LLCs to conceal their identities and ownership interests in Compass, in order to exert control and personally enrich themselves." Compl. ¶ 151. Second, beginning in 2020, they "devised and carried out a scheme to defraud the SBA by misusing [COVID-19] relief funds and concealing their improper uses in order to personally enrich themselves." Compl. ¶ 153.

Both alleged schemes, described in detail in the Factual Background, *supra*, had the same purpose and result of enriching the Hafts at the expense of those they did business with. Both victimized Mr. Suarez—with the scheme to misuse COVID-19 relief funds also harming others (including the SBA). And both were committed by means of fraudulent misrepresentations which Mr. Suarez has alleged with sufficient particularity to satisfy the requirements of Rule 9(b). *See Bridges*, 842 F. Supp. 2d at 265. "The predicate acts alleged thus 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Tr. Agreement of Steven M. Sushner v. C.A. Harrison Companies, LLC*, No. 22-cv-2837, 2023 WL 6313507, at *8 (D.D.C. Sep. 28, 2023) (quoting *H.J. Inc.*, 492 U.S. at 240).

That is not to say that Mr. Suarez's RICO claim is airtight. On the contrary, the Defendants point to various authorities suggesting that Mr. Suarez's allegations, especially those pertaining to the "relatedness" of his two alleged schemes, are right on the line of what constitutes a plausible RICO claim. *See, e.g.*, Defs.' Mem. Supp. Mot. Dismiss 14–17, ECF No. 11-1 (discussing *Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446 (6th Cir. 2019)). Indeed, the Defendants may ultimately prove, after further factual development and discovery, that Mr. Suarez's claims amount to an ordinary "business dispute," not a RICO violation. *Id.* at 1.

At this early stage, however, the relatedness requirement is not a "cumbersome one for a RICO plaintiff," and the criteria for evaluating relatedness should be "generously construed." *Lu v. Lezell*, 45 F. Supp. 3d 86, 97 (D.D.C. 2014) (cleaned up). The "same or similar purposes, for example, can be as generic as the desire to defraud those who deal with the enterprise; the results may be no more than to have achieved that objective; the participants need not be the same over the course of the scheme; the victims may be related to one another only in the sense that they all were engaged in business dealings with and were defrauded by the defendants through the enterprise; and the methods of commission may be similar only by virtue of the fact that they constitute fraud." *Id.* (cleaned up). Mr. Suarez has alleged "at least that much here." *Id.*; *see also Tr. Agreement of Steven M. Sushner*, 2023 WL 6313507, at *8 (finding pattern and relatedness elements plausibly alleged where real estate developer perpetrated two fraudulent schemes aimed at "enlarging [his] ownership of or revenue" from an LLC he shared with investors).

### 2.    Standing to Sue Over COVID-19 Relief Funds

The RICO statute provides a private right of action to "[a]ny person injured in his business or property by reason of a [RICO] violation." 18 U.S.C. § 1964(c). To have standing to sue for a RICO violation, a plaintiff must allege (1) that he suffered an injury to his business or property and (2) that the defendant's RICO violation "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–68 (1992).

The Supreme Court has advised that "[p]roximate cause . . . is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (cleaned up). It requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. This means a plaintiff must allege a link between their injury and a defendant's RICO predicate acts that is not

"too remote" or "purely contingent" on intervening factors or "the independent actions of third and even fourth parties." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9, 15 (2010). But it does not mean that the plaintiff is required to show "first-party reliance" on a defendant's fraudulent misrepresentations. *Bridge*, 553 U.S. at 648–50. The more important inquiry is whether the plaintiff has a "straightforward" theory for how the defendant's actions caused their injury. *Hemi Grp.*, 559 U.S. at 14–15 (comparing the plaintiff's untenable causation theory which rested on "multiple steps . . . independent factors . . . [and] the independent actions of third and even fourth parties" with the "straightforward" causation theory advanced in *Bridge*, 553 U.S. at 657–58); *see also Albert v. Glob. Tel*Link*, 68 F.4th 906, 913 (4th Cir. 2023) (finding that the higher prices incurred by plaintiffs using inmate telephone services were "logically related" to fraudulent misrepresentations made by the service providers to the governments that bought the services).

Here, Mr. Suarez has very clearly alleged that he suffered injuries to his property that were proximately caused by the Defendants' misrepresentations about his ownership interest in Compass. And the Defendants do not appear to dispute that Mr. Suarez has standing to bring a RICO claim on that basis (notwithstanding their other objections to the sufficiency of that claim). Rather, they challenge Mr. Suarez's standing only as it relates to the RICO predicate acts that he alleges they carried out as part of their scheme to misuse COVID-19 relief funds. The Court finds this argument puzzling and ultimately unpersuasive.

As an initial matter, the Court sees no basis for concluding, as the Defendants appear to argue, *see* Defs.' Mem. Supp. Mot. Dismiss at 21, that Mr. Suarez must show he was proximately injured by *every* RICO predicate act or scheme that he alleges was part of the Defendants' pattern of RICO activity. Indeed, reaching such a conclusion would seem to foreclose a huge swathe of RICO claims as it would severely limit the acts a plaintiff might point to as evidence of a "pattern

of RICO activity." For example, in *H.J. Inc.*, the Supreme Court explained by way of illustration that a RICO pattern would "surely be established" where "a hoodlum [sold] 'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the 'premium' that would continue their 'coverage.'" 492 U.S. at 242. The Defendants' proposed rule, however, would prevent a plaintiff storekeeper in that situation from pointing to the hoodlum's shaking down of other storekeepers as evidence of a RICO pattern because she herself would have suffered no property injury from those shakedowns. It would similarly prevent a plaintiff tricked into investing in a get rich quick scheme from pointing to other plaintiffs who had been similarly defrauded. *See, e.g.*, *Lu*, 45 F. Supp. 3d at 99. Just as it would also prevent a defrauded real estate investor from relying on allegations that "other would-be investors were essentially cheated out of their money." *See, e.g.*, *Tr. Agreement of Steven M. Sushner*, 2023 WL 6313507, at *8. Accordingly, insofar as the Defendants propose that a RICO plaintiff must prove that he was proximately harmed by every alleged predicate act constituting the pattern of racketeering activity, that rule is plainly wrong.

To the extent the Defendants' standing argument is only that Mr. Suarez's Complaint does not allege facts supporting his ability to recover damages for injuries flowing from their alleged scheme to misuse COVID-19 relief funds, they are wrong about that too. The crux of that alleged scheme is that the Defendants made fraudulent misrepresentations to the SBA, to Mr. Suarez, and to the public about how they were spending millions of dollars in relief funds. When the Defendants were meant to be paying for core business expenses like rent—and were representing that they were doing so—they were instead diverting funds into other ventures for their personal enrichment. This conduct directly affected Mr. Suarez because he had "jointly and severally guaranteed Compass's leases." Compl. ¶¶ 87–92. Because he relied on the Defendants'

representations that they were spending the relief funds properly, Mr. Suarez had no reason to think that he should take action to ensure that the rent obligations were being met on the leases he had guaranteed. Compl. ¶ 90. Nor did he have reason to expect that he would be personally sued by one of Compass's landlords for nonpayment of rent, and thereby incur thousands of dollars in legal fees. Compl. ¶ 87.

The legal fees Mr. Suarez incurred are a clear injury to his property. *See* 18 U.S.C. § 1964(c). And he has sufficiently shown that the Defendants' predicate acts were a proximate cause of that injury. Once again, this is not an easy call. Mr. Suarez does have at least one link in his causal chain—the decision by Compass's landlord to file suit—that places an "independent action" by a third party between the Defendant's predicate acts and his injury. *See Hemi*, 559 U.S. at 15. Nonetheless, the Court is not convinced this makes Mr. Suarez's injury "too remote" or too "contingent" on outside factors. *Id*. at 9. Landlords do not usually tolerate the nonpayment of rent indefinitely. It is expected they will take action to recover their lost income against those who have guaranteed that they will be paid—indeed, it would be surprising if they did not do so. Mr. Suarez has thus plausibly alleged a sufficiently straightforward causation theory for how the Defendants' unlawful diversion of COVID-19 relief funds caused him to be sued for nonpayment of rent and to suffer a compensable injury to his property as a result. *See Solomon v. Dechert LLP*, No. 22-cv-3137, 2023 WL 6065025, at *11 (D.D.C. Sep. 18, 2023) (predicate act may proximately cause injury where it is "decisive in influencing a third party's injurious action").

### 3.    Statute of Limitations

A statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). And a plaintiff is not required to include allegations anticipating such a defense in their complaint. *See Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 343 n.12 (D.C. Cir. 1991); *see also* 5 *Wright & Miller's*

*Federal Practice & Procedure* § 1276 (4th ed. 2025) (A complaint's inclusion of "allegations that seek to avoid or defeat a potential affirmative defense" is "technically . . . improper pleading because these allegations are not an integral part of the plaintiff's claim for relief and lie outside his or her burden of pleading."). Accordingly, the D.C. Circuit has "repeatedly held" that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (first citing *Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981); and then citing *Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971)). And the D.C. Circuit has emphasized that, "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Id.*; *see also Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 308 (D.D.C. 2012) ("[A] court should grant a pre-discovery motion to dismiss on limitations grounds only if the complaint on its face is conclusively time-barred, and the parties do not dispute when the limitations period began." (cleaned up)). The Defendants have not established that such circumstances exist here.

Civil RICO actions are subject to a four-year statute of limitations, which begins to run from the date the alleged injury is discovered. *Feld*, 873 F. Supp. 2d at 308. "Under the discovery rule, 'a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing.'" *Id.* (emphasis omitted) (quoting *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 274 (D.D.C. 2007)). Here, the Parties do not agree on when the limitations period began. And the Complaint on its face does not show that Mr. Suarez's RICO claim is "conclusively time-barred." *Firestone*, 76 F.3d at 1209.

Mr. Suarez alleges that it was not until 2022, after his termination, that he discovered Colby Bartlett's true ownership. It was only after that discovery that he understood "Michael [Haft] had secretly had a larger share of the business *since day one*," and that the Hafts had been lying to him all along "to manipulate him into relinquishing his ownership and authority in Compass." Compl. ¶¶ 61, 63. Mr. Suarez alleges that he discovered the scheme to misuse COVID-19 funds around the same time. Compl. ¶ 93. If Mr. Suarez ultimately proves these allegations—*i.e.*, that he did not discover his RICO injuries until 2022—this lawsuit (filed in January 2025) is well-within the four-year statute of limitations. On top of these baseline allegations supporting timeliness, Mr. Suarez alleges that he and Michael Haft executed a tolling agreement that "tolled the statutes of limitation for any and all rights or claims that had not expired as of July 19, 2021 for the period from July 19, 2021 through July 31, 2024." Compl. ¶ 128. Mr. Suarez also asserts that even if this agreement was somehow invalid, the Court would be justified in tolling the statute of limitations on equitable estoppel grounds because the Hafts' "affirmative misconduct lulled him into inaction." Pl.'s Opp'n Mot. Dismiss at 26–27 (citing *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)).

The Defendants, unsurprisingly, take issue with Mr. Suarez's assertions. They argue that his RICO claim may have accrued as early as 2018, when he discovered the nature of Octa's true ownership, Defs.' Mem. Supp. Mot. Dismiss at 19; that his and Michael Haft's tolling agreement only tolled claims between January 31, 2024 to July 31, 2024, *id.* at 21; and that the Hafts' "kindness" in welcoming Mr. Suarez into their family home and giving him a "free lunch" is not a basis for equitably tolling the period in which he had to bring his RICO claim, Defs.' Reply Supp. Mot. Dismiss at 17. The Defendants may ultimately convince a factfinder that Mr. Suarez's RICO claim accrued before 2022. The Court suspects, for example, that Mr. Suarez may be hard pressed to prove that he was still unaware of his claim after the "glaringly obvious injury" of his

"termination" in July 2021. *See Solomon*, 2023 WL 6065025, at *5. For now, however, the many "contested questions of fact" that must be resolved to properly decide this issue make it inappropriate to dismiss Mr. Suarez's RICO claim on this basis at this early stage. *See Firestone*, 76 F.3d at 1209.

*       *       *

For all the above reasons, the Court denies the Defendants' Motion to Dismiss as to Count I and concludes that Mr. Suarez's RICO claim survives dismissal.

### B.    Fraud (Count II)

Next, Mr. Suarez alleges that Michael and Robert Haft fraudulently induced him to assign his ownership in the "Compass brand intellectually property" to Compass Coffee LLC for $0 by falsely assuring him that he and Michael Haft were equal partners in the company. Compl. ¶¶ 167–74. The Defendants argue that Mr. Suarez has not pleaded his fraud claim with sufficient particularity and that it is time-barred in any event. Defs.' Mem. Supp. Mot. Dismiss at 25. The Court finds neither argument persuasive.

To state a claim for fraud under D.C. law, a plaintiff must allege that a defendant (1) made a false representation, (2) in reference to a material fact, (3) with knowledge of the representation's falsity, (4) with the intent to deceive, and (5) that the plaintiff acted in reliance on the representation. *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977). Rule 9(b) requires that a plaintiff alleging fraud "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This means that a plaintiff must allege the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *U.S. ex rel. Williams*, 389 F.3d at 1256 (cleaned up).

Here, Mr. Suarez alleges that the Hafts repeatedly misrepresented to him that he and Michael Haft were equal partners in Compass Coffee LLC. Compl. ¶ 168. The Complaint identifies multiple specific instances where such representations were made including their "time, place and content." *See, e.g.,* Compl. ¶¶ 45, 49–51, 155 (identifying multiple statements, the dates they were made, and the content they included that affirmatively or by omission suggested that Mr. Suarez and Michael Haft were equal partners). Mr. Suarez further alleges that the Hafts knew these statements were false because they had taken steps to ensure Michael Haft secretly had a larger share of the business than Mr. Suarez from day one. Compl. ¶¶ 40–42. Finally, Mr. Suarez alleges that he agreed to assign his 50% interest in HaftSuarez—the original LLC which owned the Compass brand's intellectual property—to Compass *for free* in reliance on the Hafts' false representations that he and Michael Haft were equal partners. Compl. ¶¶ 168–70. Mr. Suarez alleges that he would never have given away this interest—potentially worth tens of millions of dollars—had he not believed the Hafts' representations that "he was an equal partner in the business and that his financial interest in Compass was secure." Compl. ¶¶ 169–70. In light of these detailed allegations, the Court is satisfied that Mr. Suarez has plausibly alleged the elements of fraud with the particularity required by Rule 9(b).

As to the Defendants' argument that Mr. Suarez's fraud claim is time-barred, the Court has already noted that dismissing a claim on statute of limitations grounds is appropriate only if it is clear from the face of the complaint that the claim is "conclusively time-barred." *Firestone*, 76 F.3d at 1209. Here again, dismissal on statute of limitations grounds is inappropriate.

Unlike his RICO claim, Mr. Suarez's fraud claim is subject to a slightly shorter three-year statute of limitations. *See Lu*, 45 F. Supp. 3d at 93 (citing D.C. Code § 12-301(8)). The Defendants argue that Mr. Suarez's claim is untimely because it would have accrued in August 2020—when

Mr. Suarez learned that the Compass brand was valued at $34 million. Defs.' Mem. Supp. Mot. Dismiss at 28. It is not clear to the Court, however, why this would be the date Mr. Suarez's claim accrued. He does not allege that he transferred his interest in the Compass brand to Compass Coffee LLC for $0 because he was unaware of its value. He alleges that he made the transfer because he believed he held an equal ownership in Compass to Michael Haft, just as the two had shared an equal ownership interest in HaftSuarez LLC. Compl. ¶ 170. It thus seems more likely that Mr. Suarez's claim accrued at the point he had reason to believe that he and Michael Haft were not in fact equal partners in Compass. As discussed in the context of the RICO claim, this date is contested by the Parties and may possibly have been as late as 2022.

Finally, even accepting the Defendants' proposed accrual date, Mr. Suarez argues that his fraud claim is still timely because it was tolled by agreement and because any failure on his part to take timely action was a result of the Defendants affirmatively lulling him into inaction. Pl.'s Opp'n Mot. Dismiss at 32–33. Given these "contested questions of fact" that must be resolved to properly decide this issue, dismissing Mr. Suarez's fraud claim on timeliness grounds at this early stage is inappropriate. *See Firestone*, 76 F.3d at 1209.

Because Mr. Suarez has plausibly alleged the elements of his fraud claim, and because his claim is not conclusively time-barred on its face, the Court concludes that Count II survives dismissal.

### C.    Breach of Contract as to Robert Haft (Count III)

Mr. Suarez claims that the Defendants breached Compass's Fifth Amended Operating Agreement when, after his termination, they refused to buy back his ownership shares at a fair market value. Compl. ¶ 180. While the Defendants do not seek dismissal of this claim as to Michael

Haft or Compass, they assert that it cannot be brought against Robert Haft because he was not a party to the Agreement. The Court agrees.

As an initial matter, the Complaint alleges and the Parties agree that Mr. Suarez's breach of contract claim is governed by Delaware law based on the express terms of the Fifth Amended Operating Agreement. *See* Compl. ¶ 105; Defs.' Mem. Supp. Mot. Dismiss at 29; Pl.'s Opp'n Mot. Dismiss at 33–35 (applying Delaware law), 35 n.10. To state a claim for breach of contract under Delaware law, a plaintiff must allege: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC, v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). Generally speaking, "only a party to a contract may be sued for breach of that contract," and officers of a corporation or LLC will not be held personally liable for corporate contracts "as long as they do not purport to bind themselves individually." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (noting that "similar liability shields . . . are provided by corporations and LLCs to their respective owners").

Here, the parties to the contract at issue—Compass's Fifth Amended Operating Agreement—were Mr. Suarez, Michael Haft, Four Properties LLC, Colby Bartlett LLC, and Hexad LLC. Compl. ¶ 176. While Robert Haft signed the Agreement on behalf of the three LLCs, *id.*, he was not himself a party. Delaware law thus generally dictates that he had no contractual obligations under the Agreement and cannot be sued for its breach. Mr. Suarez attempts to avoid this conclusion in two ways. First, he argues that the Court may "pierce the corporate veil" of the LLCs to get at Robert Haft because the LLCs are merely instrumentalities that the Haft family created to carry out their fraudulent activities. Pl.'s Opp'n Mot. Dismiss at 33. Second, he argues

that Robert Haft can be held liable as a signatory to the Agreement even if he is not formally a party. *Id.* at 33–34. Neither of these arguments carries the day.

Mr. Suarez correctly notes that "Delaware law permits a court to pierce the corporate veil where there is fraud or where the corporation is in fact a mere instrumentality or alter ego of its owner." *NetJets*, 537 F.3d at 176 (cleaned up). But persuading a court to take such a step is "a difficult task." *Wallace*, 752 A.2d at 1180 (quoting *Harco Nat. Ins. Co. v. Green Farms. Inc.*, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sep. 19, 1989)). It requires a plaintiff to allege that the individual or entity they are attempting to hold liable has "exclusive domination and control" over the entity in question. *Id.* at 1184; *see Oliver v. Boston Univ.*, No. 16570, 2000 WL 1091480, at *9, *12 (Del. Ch. July 18, 2000) (holding that a Massachusetts LLC created "solely to serve" the interests of its owner and "completely dominated" by the owner could be fairly characterized as the owner's "alter ego"). As the Second Circuit has explained in applying Delaware law on this issue, the entities in question must effectively operate "as a single economic entity such that it would be inequitable . . . to uphold a legal distinction between them." *NetJets*, 537 F.3d at 177 (cleaned up).

Mr. Suarez has not met this standard. The allegations in the Complaint, even if proven in their entirety, would not establish that Robert Haft exerts "exclusive domination and control" over any of the three LLCs that are parties to the Fifth Amended Operating Agreement. *See Wallace*, 752 A.2d at 1184. While the Complaint is replete with allegations of how the Hafts led Mr. Suarez to believe that Colby Bartlett LLC and Robert Haft were one in the same, the reality Mr. Suarez later discovered—and, indeed, one of the critical pillars of his other claims—is that Colby Bartlett was in fact only 4% owned by Robert Haft and 96% owned by his children. Compl. ¶ 42. In the face of that allegation, the Court cannot reasonably infer that Colby Bartlett was completely

dominated by Robert Haft, that it solely served his interests, or that it could be fairly characterized as his alter ego. *See Oliver*, 2000 WL 1091480, at *9, *12.

This is even more true of Octa LLC. While Mr. Suarez similarly alleges that the Hafts misled him into believing that Octa was "equivalent to Robert Haft," Compl. ¶ 168, he now knows and alleges that Octa was always 100% owned by Michael Haft, Compl. ¶ 43. It seems then that if the Court were to pierce Octa's corporate veil, it would stab Michael Haft, not Robert.

Finally, the Complaint says very little about Four Properties LLC. Other than being a party to Compass's Operating Agreement, Mr. Suarez generally alleges that Four Properties is a "Haft Family Enterprise," Compl. ¶ 134, and that in 2020, Robert Haft made "several transfers" of shares that Four Properties held in a separate business to Michael, Colby Bartlett, and Hexad, Compl. ¶ 145. These allegations are insufficient to support a reasonable inference that Four Properties was a "mere instrumentality" or "alter ego" of Robert Haft. *NetJets*, 537 F.3d at 176.

Mr. Suarez's secondary argument—that Robert Haft can be held liable as a signatory to the agreement even though he is not formally a party—fares no better. Mr. Suarez cites only one case, *International Rail Partners, LLC v. American Rail Partners, LLC*, for the proposition that "[a]s a matter of ordinary course, parties who sign contracts and other binding documents are bound by the obligations that those documents contain." No. 2021-1029, 2025 WL 972576, at *15 (Del. Ch. Mar. 31, 2025) (cleaned up); Pl.'s Opp'n Mot. Dismiss at 34. But that case does not support Mr. Suarez's position. The court in *International Rail Partners* did not find, as Mr. Suarez asks the Court to find here, that a *non-party* signatory to a contract was bound by the contract. Rather, it found that a contracting party to a settlement agreement did not "owe any obligations" under" a "Side Letter" that the parties had contemporaneously executed. *Id.* 17. The Court thus sees no basis for deviating from the general rule of not allowing parties to be sued for breaching

contracts to which they are not a party. *Wallace*, 752 A.2d at 1180. Accordingly, the Court dismisses Mr. Suarez's breach of contract claim against Robert Haft under Count III.

### D.    Breach of Implied Duty of Good Faith and Fair Dealing (Count IV)

Mr. Suarez next alleges that the Defendants breached the implied duty (or covenant) of good faith and fair dealing by failing to act in good faith to bring about the repurchase of his Founder Units. Compl. ¶¶ 186–91. The Defendants argue that Mr. Suarez's allegations of bad faith are too general and that the issue in dispute—the repurchase of Mr. Suarez's Units—is expressly covered by the Fifth Amended Operating Agreement. Defs.' Mem. Supp. Mot. Dismiss at 30–33. Accordingly, they argue, Mr. Suarez's implied covenant claim is duplicative of his breach of contract claim and must be dismissed. *Id.* at 33. The Court disagrees.

The Parties do not dispute that Delaware law governs this claim. Defs.' Mem. Supp. Mot. Dismiss at 31 n.7; Pl.'s Opp'n Mot. Dismiss at 35 n.10. Under Delaware law, the implied covenant of good faith and fair dealing "inheres in every contract" and requires contracting parties to "refrain from arbitrary or unreasonable conduct" that prevents another party from "receiving the fruits of the bargain." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 145–46 (Del. Ch. 2009) (cleaned up). The implied covenant does not apply when there are express terms in an agreement that cover the disputed issue. *Id.* at 146. Rather, it is used by Delaware courts to fill unanticipated "gaps" in the express contractual terms. *Buck v. Viking Holding Mgmt. Co. LLC*, No. N20C-08-249, 2021 WL 673459, at *5 (Del. Super. Ct. Feb. 22, 2021). To state a claim for breach of the implied covenant, a plaintiff must allege: "(1) a specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damage." *Williams v. Progressive Direct Ins. Co.*, 631 F. Supp. 3d 202, 215 (D. Del. 2022) (cleaned up).

Federal courts applying Delaware law have routinely found, consistent with Federal Rule of Civil Procedure 8(d)(2), that plaintiffs may plead claims for breach of contract and breach of the implied covenant in the alternative.[4] *See, e.g.*, *Teva Pharms. USA, Inc. v. Biogen Int'l GmbH*, 753 F. Supp. 3d 358, 368 (D.N.J. 2024) (declining to dismiss the plaintiff's "backstop" implied covenant claim, which was "advanced in the alternative to a breach of contract claim . . . and based on the same underlying allegations" (cleaned up)). This is because a factfinder that ultimately determines a plaintiff should not prevail "on its breach of contract claim"—perhaps because it finds the contract's express terms have not been violated—may still find the plaintiff "should win on its implied covenant claim." *Id.*

That reasoning is applicable here. Mr. Suarez alleges that the Fifth Amended Operating Agreement contained an implied covenant that the parties to the Agreement "would act in good faith to bring about the repurchase of [Mr. Suarez's] Units." Compl. ¶ 188. He alleges that the Defendants breached that implied covenant by not acting in good faith, and thereby deprived him of the benefit of their agreement—*i.e.*, the ability to sell his shares back to Compass at a Fair Market Value. Compl. ¶¶ 102–27, 189. The provisions in the Fifth Amended Operating Agreement addressing the "Repurchase of Founder Units" do not expressly require the parties to act in good faith in bringing about the repurchase of Founder Units. Compl. ¶¶ 102–04. It is thus conceivable that a factfinder might ultimately conclude that the Defendants' actions, even if made in bad faith, did not breach the Agreement itself but did violate the implied covenant. *Cf. Stewart v. BF Bolthouse Holdco, LLC*, No. 8119, 2013 WL 5210220, at *16–17 (Del. Ch. Aug. 30, 2013) (dismissing implied covenant claim where contract expressly required the defendant to act in good

---

[4] Rule 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2).

faith and thus the court could not conceive of circumstances where the defendant's alleged bad faith conduct could breach the implied covenant but not the contract).

Mr. Suarez has thus plausibly alleged the elements of his implied covenant claim. That claim is not inherently duplicative of his breach of contract claim and, Rule 8(d)(2) permits Mr. Suarez to plead it in the alternative. Accordingly, Count IV survives dismissal.

### E.    Breach of Fiduciary Duty (Count V)

Next, Mr. Suarez alleges that Michael and Robert Haft breached the fiduciary duty of loyalty and care they owed him as co-members of the Compass Coffee LLC. Compl. ¶¶ 193–97. This claim, too, survives dismissal.

As an initial matter, the Parties dispute whether Delaware or D.C. law applies to this claim. The Defendants argue that Delaware law applies pursuant to the "internal affairs doctrine." Defs.' Mem. Supp. Mot. Dismiss at 33. "The internal affairs doctrine is a conflict-of-laws principle recognizing that a corporation's internal affairs should not be subject to regulation by more than one jurisdiction." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1348 (D.C. Cir. 2024) (first citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); and then citing Restatement (Second) of Conflict of Laws § 302 (A.L.I. 1971)). The doctrine generally holds that when a claim involves matters of corporate governance or other internal affairs of a company or LLC, the applicable law is "the law of the state of incorporation." *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009); *see also Cowin v. Bresler*, 741 F.2d 410, 414 n.4 (D.C. Cir. 1984) (applying the law of Delaware to "common law claims of corporate mismanagement, fraud, and self-dealing" because the corporation at issue was "incorporated in Delaware"); *Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1268 (D.C. Cir. 1972) ("Kay, being a Delaware corporation, the fiduciary obligations of its officers and directors are to be determined upon the ascertainment and proper

application of the law of Delaware."). The underlying rationale for the doctrine is that "[t]he state of incorporation has a strong interest in having its law applied to matters of corporate governance and other internal affairs for the obvious reason that the corporation exists under its laws." *Labovitz v. Washington Times Corp.*, 900 F. Supp. 500, 503 (D.D.C. 1995).

Mr. Suarez responds by citing two cases for the proposition that the Fifth Amended Operating Agreement's choice of law provision is too narrow to govern non-contract claims, and he argues that D.C. law should apply to his claim because it is the jurisdiction with the "most significant relationship" to the dispute. Pl.'s Opp'n Mot. Dismiss at 39–40. Mr. Saurez does not, however, directly address the Defendants' argument that the internal affairs doctrine requires the application of Delaware law to this claim. And the Court sees no basis for ignoring that doctrine here. Compass Coffee LLC is incorporated in Delaware and it thus seems appropriate that any fiduciary obligations owed to Mr. Suarez by the Hafts as members of the Compass LLC should be determined and analyzed under Delaware law. *See Weiss*, 470 F.2d at 1268.

To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege (1) that a fiduciary duty existed and (2) that the defendant breached that duty. *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840–41 (Del. Ch. 2022). Members of Delaware LLCs generally "owe two fiduciary duties—loyalty and care." *Id.* at 842. The duty of loyalty requires that corporate directors act in the best interest of the corporation and not "use their position of trust and confidence to further their private interests." *Id.* (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). The duty of care mandates that directors act with "reasonable care, competence, and diligence"—they may not be reckless or grossly negligent. *Id.* at 844–45.

Here, Mr. Suarez alleges that Michael and Robert Haft owed him a fiduciary duty as co-members of the Compass Coffee LLC. Compl. ¶ 193; *see also* Compl. ¶ 108 (identifying Michael

and Robert Haft as "Compass Coffee's Board of Directors"). He alleges that they breached that duty when they "[1] failed to disclose material facts concerning Compass's true ownership, [2] induced [him] to assign away his 50% interest in Compass's brand for no consideration, [3] refused to fairly value [his] share in the Company, [4] refused to effectuate the repurchase of [his] Unit's at fair market value, [5] misused Covid relief funds without [his] knowledge, and [6] engaged in other misconduct designed to enrich themselves at [his and Compass's] expense." Compl. ¶ 196. He also alleges that this breach "proximately caused" him injury. Compl. ¶ 197.

In attacking Mr. Suarez's claim, the Defendants make many of the same arguments the Court has already rejected in the context of other claims. *See* Defs.' Mem. Supp. Mot. Dismiss at 33–34 (that Mr. Suarez's claim is time-barred), 34–35 (that allegations of fraud related to Compass's ownership and Mr. Suarez's transfer of his interest in the Compass brand are not "pled with particularity"), 35–36 (that allegations regarding failure to repurchase Mr. Suarez's Founder Units at a fair market value are duplicative of his breach of contract claim), 36–38 (that alleged misappropriation of COVID-19 relief funds did not "proximately cause[]" any direct harm to Mr. Suarez). Here again, the Court finds the Defendants' arguments unpersuasive.

As described at length above, Mr. Suarez's fraud claims are alleged with sufficient particularity. He is entitled by Rule 8(d)(2) to plead claims, including this one, in the alternative to his breach of contract claim. Fed. R. Civ. P. 8(d)(2); *see also Garfield ex. rel. ODP Corp. v. Allen*, 277 A.3d 296, 361–62 (Del. Ch. 2022) (where plaintiff alleged claims for breach of contract and fiduciary duty based on a "common nucleus of operative fact," "a pleading-stage ruling [was] unlikely to simplify discovery or the presentation of the evidence" and thus there was "no benefit" to "delving into the alternative theories to assess how they may interact"). And, finally, Mr. Suarez has plausibly alleged that the Hafts spent COVID-19 relief funds intended for Compass on

ventures aimed at their personal enrichment. He has also plausibly alleged that this misappropriation of funds proximately caused him injury because it resulted in him being sued by one of Compass's landlords for nonpayment of rent on a lease that he had personally guaranteed. This is a direct and personal injury for which only Mr. Suarez can recover. His claim is therefore not derivative of harm done to Compass by the Hafts' alleged breach.

For all these reasons, Count V may proceed.

## II.    Motion for Partial Summary Judgment

In addition to seeking dismissal, the Defendants move for partial summary judgment on Mr. Suarez's claim for breach of contract (Count III). ECF No. 12. The Court finds that this motion is premature and thus denies it without prejudice.

The general rule in this Circuit is that granting "summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Convertino v. U.S. Dep't of Just.*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Anderson*, 477 U.S. at 257). Accordingly, summary judgment motions filed before discovery are usually disfavored. *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997) ("[S]ummary judgment ordinarily is proper only after the plaintiff has been given adequate time for discovery." (cleaned up)); *see also Celotex Corp.*, 477 U.S. at 322 (summary judgment is appropriate "after adequate time for discovery").

Federal Rule of Civil Procedure 56(d) provides that if a party facing summary judgment shows that "it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Rule 56(d) thus "establishes a mechanism for nonmovants who lack the facts they need to seek an opportunity to gather more information before responding to a motion for summary judgment." *Grimes v. District*

*of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015). To obtain relief under Rule 56(d), the nonmoving party must submit an affidavit or declaration that (1) outlines the particular facts they intend to discover and describes why those facts are necessary to the litigation, (2) explains why they have not been able to produce those facts, and (3) demonstrates that "the information sought is, in fact, discoverable." *FERC v. City Power Mktg., LLC*, 235 F. Supp. 3d 152, 155 (D.D.C. 2017) (citing *Convertino*, 684 F.3d at 99–100).

Here, Mr. Suarez has demonstrated an entitlement to relief under Rule 56(d). In opposing the Defendant's motion, Mr. Suarez's counsel has submitted a declaration that details multiple topics Mr. Suarez hopes to explore during discovery. *See* Pl.'s Opp'n Mot. Partial Summ. J., Ex. A, Ali Decl., ECF 16-1. For example, Mr. Suarez seeks information about the specific "inputs" that the Defendants "provided to GSG to prepare the GSG Draft Report," Ali Decl. ¶ 3.d., as well as information about representations the Defendants made to "the public," and to "lenders, potential investors, and others" about the value of the Compass business during the relevant time period, *id.* ¶ 3.e.–f. Mr. Suarez also seeks "internal communications between Michael Haft, Robert Haft," and others at Compass "about the present value of and financial projections for the Company during the relevant period." *Id.* ¶ 3.g. The Court has no difficulty understanding why fact discovery on these topics, and others, is necessary to litigate Mr. Suarez's breach of contract claim. The Court similarly finds that this information should, in fact, be discoverable (as Mr. Suarez's counsel asserts in her declaration, Ali Decl. ¶ 5). Finally, the reason Mr. Suarez does not yet have these facts is abundantly clear: discovery has not yet begun.

In light of Mr. Suarez's showing that he is entitled to relief under Rule 56(d), the Court defers ruling on the merits of the Defendants' Motion for Partial Summary Judgment as to Count

III and instead denies that motion without prejudice. The Defendants may move again for summary judgment, if they so choose, after there has been adequate time for discovery.[5]

## III.    Motion to Stay Discovery

Finally, the Court denies the Defendants' Motion to Stay Discovery as moot. The Defendants only sought to stay discovery pending resolution of the Defendants' Motions to Dismiss and for Partial Summary Judgment, which are now resolved. In the interim, Mr. Suarez has represented that he has not sought discovery and has no intention of seeking discovery prior to the Court setting a Rule 16 conference and/or issuing a scheduling order. Pl.'s Opp'n Mot. Stay Disc. at 6-7. The Court has done neither of those things and thus assumes that no discovery has occurred.

---

[5] The Court notes that Mr. Suarez's approach to discovery thus far—*i.e.*, declining to seek discovery until after the Court has ruled on the Defendants' Motion to Dismiss, set a Rule 16 conference, and issued a scheduling order—is perfectly reasonable. Rather than displaying a "lack of diligence," as the Defendants suggest, Defs.' Reply Supp. Mot. Partial Summ. J. at 9 n.6, Mr. Suarez's approach demonstrates an appropriate level of respect for the resources of the Court and the Parties by avoiding the inefficient expenditure of time or resources on discovery related to claims that might not survive dismissal. By contrast, the Defendants' suggestion that Mr. Suarez has not been diligent in pursuing discovery, while at the same time moving to stay discovery, is puzzling. Moving forward, the Court cautions both Parties that it expects discovery to be managed efficiently and collaboratively, without needless motion practice.

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the Defendants'

Motion to Dismiss, ECF No. 11. The Court denies the Defendants' Motion for Partial Summary

Judgment, ECF No. 12, and denies the Defendants' Motion to Stay Discovery, ECF No. 13.

A separate order will issue.


_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   November 3, 2025